937 So.2d 686 (2006)
George Ernest MUNOZ, Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-1297.
District Court of Appeal of Florida, Second District.
July 28, 2006.
Rehearing Denied September 28, 2006.
*687 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Donna S. Koch, Assistant Attorney General, Tampa, for Appellee.
VILLANTI, Judge.
George Munoz appeals his judgment and sentence as a habitual felony offender to fifteen years' prison for burglary of a dwelling, a second-degree felony. See § 810.02(3), Fla. Stat. (2004). He argues that the house under construction which he is accused of burglarizing cannot qualify as a dwelling and that his conviction should therefore be reduced to burglary of an unoccupied structure, a third-degree felony. See § 810.02(4)(a). We agree and reverse.
Ishmauel Dudley testified that he purchased the late nineteenth-century house burglarized by Munoz from its previous occupants to restore and resell. It was unoccupied at the time of the burglary. Dudley and his construction crew were reworking the house "from the ground up""adding two bedrooms, two bathrooms. . . totally restoring [the] house" and adding a second-floor loft. They had removed a couple of the "anterior[1] walls" and all of the plaster in order to insulate the house. A back door was removed and replaced with a "piece of plywood." And, at the time of the burglary, the phases of construction and inspections were incomplete. The pictures of the house entered into evidence show a house that had been guttedno insulation or sheetrock, unfinished flooring, debris everywhere, stacks of plywood, exposed walls, and wires dangling from the ceiling. The pictures also show garbage, buckets, and work supplies on the floor. The house had a roof over it, a bathtub, a minirefrigerator, a microwave, and miscellaneous items left behind by construction workers including clothes, tools, and tool boxes. The house also had plumbing and electricity, but the power system was temporary and "for construction purposes" only and the indoor plumbing was not in use; the workers used the Port-O-Let prominently standing in the front yard.
*688 It is undisputed that this house previously qualified as a dwelling under section 810.011. Section 810.011(2) defines a "dwelling" as "a building or conveyance of any kind, including any attached porch, whether such building or conveyance is temporary or permanent, mobile or immobile, which has a roof over it and is designed to be occupied by people lodging therein at night, together with the curtilage thereof." (Emphasis added.)
The house here had a roof over it, was designed to be occupied by people lodging therein at night, and in fact had been occupied for decades. The issue is whether it still qualifies as a dwelling even though it was undergoing massive reconstruction at the time of the burglary. In Gonzalez v. State, 724 So.2d 126, 127 n. 1 (Fla. 3d DCA 1998), the Third District noted that a home under construction but nearing completion qualified as a dwelling. However, this statement was dicta because the question of whether a home under construction was a dwelling was not at issue.[2] Further, Gonzalez did not address the language of the most recent Florida Supreme Court case on the issue, Perkins v. State, 682 So.2d 1083 (Fla.1996), discussing suitability for lodging. In Anderson v. State, 831 So.2d 702, 703 (Fla. 4th DCA 2002), the Fourth District correctly noted that the language in Gonzalez was dicta but refrained from commenting on whether a home under construction could qualify as a dwelling under the burglary statute. Therefore, this issue has apparently not been previously addressed in Florida.
In State v. Bennett, this court concluded that as long as a structure is "`designed' for eventual human habitation," it qualifies as a dwelling. 565 So.2d 803, 805 (Fla. 2d DCA 1990) (finding that a mobile home unconnected to utilities and sitting on a sales lot qualified as a dwelling under section 810.011). However, in Perkins, 682 So.2d 1083, the Florida Supreme Court suggested that a house designed for lodging by people but unsuitable for lodging may not qualify as a dwelling.[3] In Perkins, the court noted that "the legislature has extended broad protection to buildings or conveyances of any kind that are designed for human habitation. Hence, an empty house in a neighborhood is extended the same protection as one presently occupied." Id. at 1085. The court further stated:
"Occupancy is no longer a critical element under this [statutory] definition. Rather, it is the design of the structure or conveyance which becomes paramount. If a structure or conveyance initially qualifies under this definition, and its character is not substantially changed or modified to the extent that it becomes unsuitable for lodging by people, it remains a dwelling irrespective of actual occupancy. It is, therefore, immaterial whether the owner of an unoccupied dwelling has any intent to return to it."
Id. at 1084 (alteration in original; emphasis added) (quoting Perkins v. State, 630 So.2d 1180, 1181-82 (Fla. 1st DCA 1994)). Thus, Perkins recognized that to qualify as a dwelling, the structure must not only be designed to be occupied by people for lodging therein at night, but also that it must not be substantially changed to the extent that it becomes unsuitable for lodging by *689 people. The only exception would be that created by the legislature in section 810.011if a structure became unsuitable for lodging because of substantial changes occurring during a state of emergency.[4] For instance, if a hurricane caused a wall of a house to collapse, the remaining portions or remnants of the house would still qualify as a dwelling despite the fact that the character of the house had substantially changed to the extent that the house was unsuitable for lodging.
The state of emergency exception is the only one in the statute. Under the analysis in Bennett, the state of emergency exception is unnecessary for houses bereft of walls during a state of emergency because such houses are still designed for lodging. The state of emergency exception makes sense only if, as suggested by Perkins, the definition of dwelling requires that the structure is both designed for lodging by people and suitable for lodging by people. See State v. Goode, 830 So.2d 817, 824 (Fla.2002) (noting that it is also a basic rule of statutory construction that "the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless"). The legislature specifically protected houses made unsuitable for lodging during states of emergency; it did not provide the same protection for houses unsuitable for lodging for other reasons, for instance because of reconstruction or renovation. According to section 810.011 and Perkins, if the character of the house is substantially changed to the extent that it becomes unsuitable for lodging for some reason other than during a state of emergency, there is no statutory exception and the house no longer qualifies as a dwelling.
The house owned by Dudley stands in stark contrast to the one discussed in Perkins, which was clearly suitable for lodging. See 682 So.2d at 1084 (discussing the house's electricity, available well water, stove, refrigerator, washer, microwave, and assorted items in the closets and cabinets). Dudley's house was missing interior walls, sheetrock, and insulation. It was undergoing a total restoration, and the inspections of it were not yet completed. The facts that the construction workers used a temporary power pole, a minifridge, and an old microwave, shown in the pictures surrounded by stacks of garbage, buckets, and work supplies, did not make this construction site suitable for lodging by any stretch of the imagination.
Applying Perkins, the house here no longer met the definition of a dwelling under the burglary statute. See Perkins, 682 So.2d 1083 (concluding that a house that was unoccupied but suitable for lodging qualified as a dwelling). Additionally, it did not meet the statutory exception for houses made unsuitable for lodging during a state of emergency.
The evidence that Munoz entered the house under construction with intent to commit a theft was insufficient to sustain a conviction for burglary of a dwelling. As Munoz concedes, the evidence could have sustained a conviction for burglary of an unoccupied structure, see § 810.02(4)(a), which was submitted to the jury as a lesser-included offense. Therefore, we reverse Munoz's conviction and sentence for burglary of a dwelling and remand to the trial court with directions to enter a judgment of guilty of the lesser charge of *690 burglary of an unoccupied structure and to resentence Munoz.
Reversed and remanded.
DAVIS, J., Concurs.
CANADY, J., Dissents with opinion.
CANADY, Judge, Dissenting.
The majority correctly determines that the house which was burglarized by Munoz "had a roof over it, was designed to be occupied by people lodging therein at night, and in fact had been occupied for decades." (Emphasis added.) Despite this determination, the majority goes on to hold that because the renovation project had rendered the house "unsuitable for lodging," the burglarized house was not a "dwelling" under chapter 810. The majority criticizes the analysis employed by this court in Bennett and rejects it in favor of a line of analysis the majority believes is "suggested" by the supreme court in Perkins. I dissent because I conclude that the rationale of Bennett should control the disposition of the instant case. For the reasons I will explain, I conclude that the majority has misread Perkins.
In Bennett, 565 So.2d at 804, we considered whether a "mobile home which was located on a sales lot" and which "was fully furnished but unoccupied and not connected to utilities" could be considered a dwelling under chapter 810. We held that "in order to establish that the structure is a `dwelling' within the purview of the burglary statute, we believe the state must introduce some evidence that it is actually to be used for habitation." Id. at 805. In reaching this conclusion, the Bennett court stated that "the plain meaning of the word `designed' supports the state's argument" that the statutory definition of "dwelling" is "broad enough to cover a mobile home on a sales lot, because it is `designed' for eventual human habitation." Id. (emphasis added).
The Bennett court thus focused on "the plain meaning of the word `designed'" in the statutory definition of dwelling. The court understood that the designed use of a structure denotes the purpose for which the structure is eventually intended to be used. The court's analysis on this point is cogent. Design means "to plan or have in mind as a purpose" or "to devise or propose for a specific function." Webster's Third New International Dictionary 611 (1993).
Under the rationale employed in Bennett, the structure burglarized by Munoz in the instant case falls within the meaning of "dwelling" because the structure was "`designed' for eventual human habitation." 565 So.2d at 805. The structure falls within the statutory definition because it undisputedly both (a) "has a roof over it" and (b) "is designed to be occupied by people lodging therein at night." § 810.01(2). The designed use of the structure is not changed by transitory circumstancessuch as a major renovation projectthat render the premises temporarily uninhabitable.
A mobile home located on a sales lot and unconnected to utilities would not be suitable for current habitation. But under Bennett's reading of the plain language of the statute, even though such a structure is temporarily unsuitable for habitation, it will be considered a "dwelling" if it is intended for "eventual human habitation." The current habitability test utilized by the majority therefore is inconsistent with the plain language of the statute and cannot be reconciled with the rationale utilized by the Bennett court.
The majority apparently recognizes that its decision is in tension with the holding in Bennett but concludes that the supreme court's decision in Perkins provides the *691 appropriate basis for deciding this case. In my view, the majority's understanding of Perkins is not supportable.
In Perkins, the court considered whether an unoccupied structure qualified as a dwelling under chapter 810. Recognizing that under the common law there was a "requirement that the house be occupied or that the owner intend to return," the court concluded that the adoption of the statutory definition of "dwelling" had effected a change in the substance of the law. 682 So.2d at 1084. The court  following the analysis of the First District  held that actual or intended occupancy was not necessary for a structure to be a dwelling under the statutory definition. Quoting the opinion of the First District, the court explained the significance of the statutory definition:
"Occupancy is no longer a critical element under this [statutory] definition. Rather, it is the design of the structure or conveyance which becomes paramount. If a structure or conveyance initially qualifies under this definition, and its character is not substantially changed or modified to the extent that it becomes unsuitable for lodging by people, it remains a dwelling irrespective of actual occupancy. It is, therefore, immaterial whether the owner of an unoccupied dwelling has any intent to return to it."
Id. (alteration in original) (quoting Perkins v. State, 630 So.2d 1180, 1181-82 (Fla. 1st DCA 1994)).
From this statement, the majority in this case reasons that to maintain the status of a dwelling, a structure "must not be substantially changed to the extent that it becomes unsuitable for lodging by people." The majority thus concludes that when a renovation project  such as the one involved in this case  is undertaken on a house, the house loses its status as a dwelling because the ongoing renovation project makes the house unsuitable for lodging.
In reaching this conclusion, the majority fails to give due weight to the importance the Perkins court assigns to the word "designed" in the statutory definition. Perkins makes clear beyond any doubt that in determining whether a structure is a dwelling, "`it is the design of the structure'" which is "`paramount.'" Id. (quoting Perkins, 630 So.2d at 1181). Perkins also acknowledges that the statute extends "broad protection to buildings ... of any kind that are designed for human habitation." Id. at 1085. And the supreme court in Perkins specifically focuses on the fact that "the owner [of the structure] intended it be used" as a structure for lodging people at night. Id.
In context, the reference in Perkins to the requirement that a structure's "`character... not [be] substantially changed or modified to the extent that it becomes unsuitable for lodging,'" 682 So.2d at 1084 (quoting Perkins, 630 So.2d at 1181) (emphasis added), must be understood as a requirement that the use for which the structure is designed not be altered. What is in view is the possibility that a residential structure will be converted to a commercial or other nonresidential use. The change in "character" that the court envisions is a change in the designed purpose of the structure. Such a change in character does not include circumstances which may temporarily render a structure uninhabitable but which do not alter the purpose for which the structure is intended to be used. In the instant case, the character or the designed use of the structure remained unchanged even though the renovation project may have rendered the property temporarily unsuitable for habitation.
The tension which the majority apparently finds between Bennett and Perkins is *692 illusory. The lack of any inconsistency between Bennett and Perkins is highlighted by the fact that in the First District's Perkins opinion, the court discussed and relied on Bennett's interpretation of "the plain meaning of the word 'designed' contained in the statute." Perkins v. State, 630 So.2d 1180, 1182 (Fla. 1st DCA 1994). The First District expressly "adopt[ed] the[ ] rationale" of Bennett. Id. The supreme court in turn in its Perkins opinion approved the First District's decision.
As I mentioned earlier, the majority acknowledges that the structure at issue here was "designed to be occupied by people lodging therein at night." Given the text of the statutory definition, that characterization of the structure should be of crucial importance. But the majority brushes aside its own characterization of the design of the structure, overlooks the "paramount" importance that Perkins assigns to the "design of the structure," and then deploys a test  current habitability  that is inconsistent with the plain language of the statute and cannot be reconciled with the rationale of our decision in Bennett.
The majority is unjustified in relying on the second sentence of the definition of dwelling in section 810.011(2) to transform the meaning of the first sentence of that definitional provision. The majority reasons that the "state of emergency exception" in the second sentence of the statutory definition "makes sense only if ... the definition of dwelling requires both that the structure is designed for lodging by people and suitable for lodging by people." (Emphasis supplied.)
While the definition of dwelling was added to the statute in 1982, see ch. 82-87, § 1, Laws of Fla., the second sentence of section 810.011(2) was added effective June 1, 1993, to the definitional provision, see ch. 92-351, § 1, Laws of Fla. The latter addition to the statute is designed to ensure that dwellings damaged during a state of emergency do not lose the protection of the penalties for burglary of a dwelling. Under this provision, a house that has lost its roof or has collapsed during a state of emergency would continue to be considered a dwelling. The provision was necessary because under the definition in the first sentence of section 810.011(2), a structure is a not a dwelling unless it has a roof over it. Furthermore, a collapsed structure might fall outside the definition of dwelling because it would not be considered "a building."
Accordingly, it is by no means necessary to accept the interpretation of dwelling adopted by the majority to make sense of the state of emergency provision. That provision deals with circumstances where a dwelling suffers such extensive structural damage during a state of emergency that it would no longer be covered by the definition of dwelling in the first sentence of section 810.011(2). There is no inconsistency between the state of emergency provision and the interpretation adopted by this court in Bennett. Bennett's understanding of the meaning of "dwelling" clearly does not encompass the range of circumstances covered by the state of emergency provision. Furthermore, given the statutory history  which evidences a legislative purpose to expand the coverage of the statute  the majority is unjustified in using the second sentence of section 810.011(2) as a basis for jettisoning the plain meaning of the first sentence of that subsection and thereby contracting the coverage of the statute. In doing so, the majority allows the statutory tail to wag the dog.
NOTES
[1] We believe that Dudley meant that the interior walls had been removed to install insulation, as is suggested by the pictures of the house.
[2] In Gonzalez, 724 So.2d 126, the defendant had removed air compressors from concrete pads adjacent to houses under construction. The Third District reversed because the compressors were not located within the houses or within the curtilage of the houses.
[3] Bennett, decided before Perkins, did not address whether a mobile home on a sales lot was suitable for lodging.
[4] The exception in section 810.011(2) states, "However, during the time of a state of emergency declared by executive order or proclamation of the Governor under chapter 252 and within the area covered by such executive order or proclamation and for purposes of ss. 810.02 and 810.08 only, the term [dwelling] includes such portions or remnants thereof as exist at the original site, regardless of absence of a wall or roof."