2012 COA 2

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Daniel Gabriel MORALES, Defendant–Appellant.**

**No. 09CA1634.**

Colorado Court of Appeals, Div. VI.

Jan. 5, 2012.

John W. Suthers, Attorney General, Carmen Moraleda, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Samler & Whitson, P.C., Eric A. Samler, Hollis A. Whitson, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

¶ 1 Defendant, Daniel Gabriel Morales, appeals the judgment of conviction entered on jury verdicts finding him guilty of second degree burglary of a dwelling and theft. We affirm.

## I. Background

¶ 2 In May 2006, Christopher Cheek purchased a house located on South Stuart Street in Denver (the Stuart home). Cheek and his business partner intended to renovate the house and sell it for a profit. During the renovation, nobody was living in the Stuart home, although testimony at trial showed the previous owner and her family had lived in the home for thirty-five years. Further, during the renovation process, the Stuart home was vacant at night and on weekends, and no lights were kept on at those times because there was no construction activity then.

¶ 3 On Friday, August 11, 2006, Cheek stopped work at the Stuart home after cleaning all the floors in the home, including the kitchen, and went home for the weekend. He did not return to the Stuart home until Monday, August 14, 2006 when he discovered that about $5,000 worth of construction tools were missing. There were no signs of forced entry. Cheek called the police a day later. During the initial investigation by police, no evidence was found, no potential witnesses were discovered, and police never recovered the stolen tools.

¶ 4 Two days after Cheek first called the police, he found a hand-rolled cigarette butt in the kitchen of the Stuart home. He called Detective Stanford, the detective assigned to the case, who collected the hand-rolled cigarette and had it tested for DNA evidence. Later DNA testing confirmed that the DNA taken from the cigarette butt matched that of defendant.

¶ 5 Testimony at trial established that on Saturday, August 26, 2006, a police officer received a call from dispatch of an alleged

burglary in progress of a house located on West Cedar Avenue in Denver (the Cedar home). The officer also received information describing the make, model, and license plate number of the suspect's van. The officer responded to the call and, while making his way toward West Cedar Avenue, noticed the van described in the call driving in front of him. He followed the van and eventually pulled it over. The officer found about $8,000 worth of construction tools in the van, and he arrested the suspect, later identified as defendant, in connection with this incident.

¶ 6 After defendant had been arrested and taken to the police station for processing, Detective Stanford arrived at the scene of the stop, having been assigned to the Cedar home case as well. The detective and other officers inspected the inside of defendant's van and found a pouch of loose tobacco, cigarette rolling papers, and, in the ashtray, several hand-rolled cigarette butts. Defendant was charged with burglary and theft in connection with the Cedar incident. He was convicted of theft and acquitted of burglary, and his conviction in that case is not part of this appeal.

¶ 7 In connection with the Stuart home burglary, defendant was charged with second degree burglary of a dwelling, a class 3 felony, and theft. At trial, evidence of the Cedar home incident was admitted as evidence of other acts pursuant to CRE 404(b). The jury found defendant guilty of both second degree burglary of a dwelling and theft. This appeal followed.

## II. Stipulation

¶ 8 Defendant contends that the trial court abused its discretion by not requiring the prosecution to stipulate to the fact that the DNA from the cigarette butt found in the Stuart home matched his DNA. We disagree.

¶ 9 The prosecution is generally entitled to prove the elements of its case against a defendant by evidence of its own choice, and a defendant "may not stipulate or admit his way out of the full evidentiary force of the case as the [prosecution] chooses to present it." *Old Chief v. United States*, 519 U.S. 172, 186–87, 117 S.Ct. 644, 136 L.Ed.2d

574 (1997); *see Martin v. People*, 738 P.2d 789, 794 (Colo.1987). However, if the defendant offers to stipulate to a fact and the prosecution's case is not thereby weakened, the prosecution may be required to accept the stipulation if the probative value of the offered evidence is substantially outweighed by the danger of unfair prejudice. *See Martin*, 738 P.2d at 794; *People v. St. James*, 75 P.3d 1122, 1125 (Colo.App.2002); *see also* CRE 401, 403.

¶ 10 In making this determination, the trial court is afforded considerable discretion, and its ruling will not be disturbed on appeal absent an abuse of that discretion. *People v. Clary*, 950 P.2d 654, 658 (Colo.App. 1997); *People v. Brewer*, 720 P.2d 583, 586–87 (Colo.App.1985).

¶ 11 As noted, a few days after the Stuart home incident, Cheek found a hand-rolled cigarette butt in the kitchen of the Stuart home. He called Detective Stanford, the detective assigned to the case, who, after learning from Cheek that he did not smoke, went to the Stuart home and retrieved the cigarette butt. Later, police were able to develop a DNA profile from saliva found on the cigarette butt.

¶ 12 After the DNA profile was developed, police compared it with DNA profiles listed in the Combined DNA Index System (CODIS). CODIS is a national DNA database that contains, most prominently, the DNA profiles of individuals who have been previously convicted of crimes. Because defendant had prior criminal convictions, his DNA profile was listed in CODIS.

¶ 13 Once it was determined that the DNA profile developed from the cigarette butt matched defendant's DNA profile listed in CODIS, the detective sought out defendant to obtain a "confirming swab"—a DNA sample of saliva and skin cells taken from the inside of defendant's cheek. As established through expert testimony at trial, the DNA profile developed from the "confirming swab" matched the DNA profile from the cigarette butt.

¶ 14 On the morning of trial, in an effort to "protect the defendant," the prosecution offered to stipulate regarding the DNA evi-

dence in the case and proposed the following stipulation:

> The prosecution and the defense stipulate to the following: DNA profile was developed from the saliva found on the cigarette butt found in Christopher Cheek's kitchen at 840 South Stuart Street. As Detective Stanford continued investigating this matter he received information concerning [defendant] as a possible suspect. You are not to speculate or draw any conclusions as to what that information was. Based upon that information the defendant ... was contacted.

¶ 15 Defense counsel rejected the proposed stipulation out of concern that the language "Detective Stanford continued investigating the matter" would mislead jurors into thinking there was additional evidence that they were not hearing. On appeal, defendant further argues that, under the prosecution's proposed stipulation, the jury would necessarily question how, after the detective obtained the DNA profile from the cigarette butt, he was led to suspect defendant and obtain the confirming swab in the first instance. In that regard, defendant contends that the jury would have been able to infer that his DNA profile was listed in a DNA database and, in turn, that he had prior criminal convictions, because the public is generally aware the DNA databases typically contain the DNA profiles of individuals with prior criminal convictions.

¶ 16 Accordingly, as an alternative to the prosecution's proposed stipulation, defense counsel stated that her preference was simply to stipulate that "the DNA matches [defendant]" and asked the court to require the prosecution to accept such a stipulation.

¶ 17 In an oral ruling, the court refused to do so, in part because of the contested issues in the case and the probative value of the prosecution's DNA evidence:

> The identification in this case is the heart of the District Attorney's case. There's no question that DNA testimony has impact and will certainly draw interest from the jury.
>
> ... But here, there is no other testimony relating to the defendant or tying the defendant in any way to the house or to

the goods involved. In that case I believe that the Court would err if I forced the District Attorney to agree to the stipulation. Accordingly, I will allow the District Attorney to present [DNA] evidence....

¶ 18 The next day, defense counsel offered her own stipulation, as follows:

> A DNA profile was developed from the saliva found on the cigarette butt found in Christopher Cheek's kitchen at 840 South Stuart Street. This DNA profile matched known samples of [defendant's] DNA. Based on this information Detective Stanford contacted [defendant] about this case.

The prosecution objected to defense counsel's proposal. Defense counsel then asked the court to require the prosecution to accept the stipulation that the "DNA evidence matches [defendant's] DNA." Again, the court declined to do so.

¶ 19 Ultimately, at trial, the prosecution called two witnesses from the Denver Crime Lab to testify regarding the DNA evidence. Detective Stanford also testified about obtaining the "confirming swab" from defendant. However, none of the prosecution's witnesses mentioned CODIS or any DNA database in their testimony, nor did they even intimate that a DNA database was used to obtain defendant's initial DNA match.

¶ 20 Based on our review of the record, we conclude that the trial court did not abuse its discretion in refusing to require the prosecution to accept defense counsel's proposed stipulation. The prosecution was entitled to prove the elements of its case against defendant by relying on DNA evidence and testimony about that evidence, especially since the crux of the prosecution's case was identifying defendant as the perpetrator of the charged crimes. Defendant's proffered stipulation would have affected the probative value of the DNA evidence as relevant to defendant's identity. *See Clary*, 950 P.2d at 658. Specifically, one of the DNA experts testified that the DNA profile taken from the cigarette butt matched defendant's DNA profile with a "reasonable degree of scientific certainty" and that the probability of randomly selecting an individual with an identical DNA profile was one in thirty-four tril-

lion. *See People v. Harland,* 251 P.3d 515, 517–18 (Colo.App.2010) (brief mention of DNA databases was relevant to issue of identity and was not inadmissible under CRE 403 or 404(b)). This testimony carried more probative weight than defendant's proposed stipulation. *See Martin,* 738 P.2d at 794.

¶ 21 Accordingly, we conclude the trial court did not abuse its discretion by not requiring the prosecution to stipulate to defendant's proposal.

### III. CRE 404(b) Evidence

¶ 22 Defendant next contends that the trial court abused its discretion in admitting evidence of the Cedar home incident pursuant to CRE 404(b). We disagree.

#### A. Standard of Review and Applicable Law

■ ¶ 23 The trial court has considerable discretion in determining the admissibility of evidence, and its ruling will not be disturbed unless it was manifestly arbitrary, unreasonable, or unfair. *People v. Rath,* 44 P.3d 1033, 1043 (Colo.2002). In reviewing the admission of such evidence, we assume the maximum probative value a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected from its introduction. *Id.*

■ ¶ 24 Pursuant to CRE 404(b), evidence of other crimes, wrongs, or acts may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, among other things. Before the trial court admits evidence of other crimes, wrongs, or acts, the other act evidence must satisfy CRE 404(b) and the test enunciated in *People v. Spoto,* 795 P.2d 1314 (Colo.1990). Thus, the trial court must assure that (1) the other act evidence relates to a material fact; (2) it is logically relevant in that it makes the existence of a material fact more or less probable than it would be without the evidence; (3) its logical relevance is independent of the prohibited intermediate inference that the defendant has a bad character; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair preju-

dice. *Rath,* 44 P.3d at 1038; *Spoto,* 795 P.2d at 1318.

#### B. Discussion

##### 1. Procedural History

¶ 25 Before trial, the prosecution filed a motion to admit, under CRE 404(b), other act evidence that defendant broke into the Cedar home and took approximately $8,000 worth of construction tools. The prosecution argued that the underlying facts of the Cedar home incident were "quite similar" to those supporting the charges in the present case. The prosecution maintained that the two incidents were similar because both homes were being professionally renovated at the time of the break-ins, both homes contained expensive construction tools, both homes were vacant on non-work days such as weekends, and the homes were close to each other, specifically, about 1.3 miles apart. Accordingly, the prosecution argued that such evidence was admissible to show a common plan, modus operandi, identity, intent, motive, or absence of mistake or accident, and to refute defenses. Later, the prosecution filed a motion to supplement its earlier CRE 404(b) motion, in which it offered additional evidence of similarity in support of admission. The prosecution pointed to evidence recovered from defendant's van in connection with the Cedar home incident, namely, loose tobacco, cigarette rolling papers, and hand-rolled cigarettes similar to the hand-rolled cigarette found in the Stuart home.

¶ 26 The trial court held a hearing, in which both the prosecution and defense counsel made arguments regarding the admissibility of the other act evidence. In an oral ruling, the trial court found the other act evidence admissible for the limited purposes of showing intent, modus operandi, and common scheme:

> What comes into this case though that's really relevant is [the] fact that the evidence in the prior case, although it's a subsequent burglary, indicates intent in the case, shows that—the fact that [defendant]—or indicates that [defendant] was not in the [Stuart home] simply with a cigarette, but that he was there to commit a burglary and to take tools because within

a week of that he had taken tools from another house that had also been under construction in a nearby neighborhood.

Given that, although I don't find it aids in identity, I do find it aids in terms of intent in establishing elements of the crime aside from showing that [defendant] is a burglar and he's the type of person to commit burglaries. I think that's an improper premise, however, it does show what his intent would be in this case. It does show somewhat, not incredibly strongly, but it does somewhat establish modus operandi in common scheme, which then would go to proof of the burglary and not just that he was just in the house.

So I do find that there is a proper purpose other than simply showing that he has propensity to commit these types of crimes.

¶ 27 The trial court subsequently issued a written order clarifying its oral ruling on the admissibility of the other act evidence. The court first rejected the prosecution's argument that the other act evidence should also be admitted to show identity. However, the court then made clear that, due to the high degree of similarity between the Cedar home incident and the facts of the present case, the other act evidence was admissible for the more limited purposes of showing modus operandi, common plan or scheme, and intent:

Significant guidance regarding the application of CRE 404(b) in this case is provided by *People v. Rath*, 44 P.3d 1033 (Colo. 2002). Although the underlying offenses in *Rath* are greatly dissimilar from the charges in this case, the permissible purpose and relevance of the other acts evidence overlaps to a significant degree. With regard to the issue of identity, as was the case in *Rath*, the Court is not precluding the use of the other acts evidence to establish that the Defendant actually committed the burglary. In such regard, identity is not synonymous with mere presence. *See Rath*, at 1040 (citing *State v. Griffin* [142 Ohio App.3d 65], 753 N.E.2d 967, 974 (Ohio App.2001)). The close proximity of the two residences, the nearness in time, the fact that both residences were being renovated, and the fact that tools

were stolen is indicative of a modus operandi and a common plan. The same evidence also makes it more probable as a logical matter that the Defendant intended to commit a theft when he entered the residence, and makes it more probable that he, in fact, committed that theft. *See Rath*, at 1041. Accordingly, evidence may be used to establish modus operandi, common plan or scheme, and intent.

¶ 28 At trial, the prosecution called four witnesses to testify concerning the incident at the Cedar home, specifically, the owner of the Cedar home, a construction worker who did renovation work at the Cedar home, Detective Stanford, and the police officer who pulled defendant over and arrested him. Before each of these four witnesses testified, the trial court gave a detailed limiting instruction to the jury, which included the following admonition:

Ladies and gentlemen, you are about to hear testimony concerning events that did not occur on the date charged in the complaint. These circumstances arose on August 26th of 2006 and shall be referred to as the August 26th incident. This evidence is being introduced for very limited purposes and you may only consider the evidence for the purposes for which it is admitted. The Court is admitting the evidence of the August 26th incident only for the purposes as you may or may not find of determining [defendant's] intent during the event charged in the complaint or his modus operandi or common plan or scheme. The defendant is entitled to be tried for the charges in the complaint in this case and for conduct in this case exclusively. You may only consider the August 26th incident for limited purposes—for the limited purposes for which I have admitted it.

The substance of the limiting instruction was also included in the written instructions to the jury after the close of evidence.

### 2. Analysis

¶ 29 Defendant contends the trial court erred in admitting the other act evidence under *Spoto*. In his opening brief on appeal, defendant contends that he is chal-

lenging admission of the other act evidence under "the first three prongs of the *Spoto* [test]" and under CRE 403. However, we read the substance of defendant's argument as limited to *Spoto's* third prong, which prohibits admission if the evidence is not logically relevant independent of the prohibited bad character inference. We limit our analysis of defendant's arguments accordingly.

¶ 30 First, defendant contends that the other act evidence was not logically relevant independent of the prohibited bad character inference because the facts of the incident at the Cedar home were too dissimilar to those in this case. We disagree.

¶ 31 The inference prohibited by CRE 404(b) is that a person of bad character "acted in conformity therewith" in the charged incident. Therefore, the third *Spoto* prong requires that other acts have non-propensity relevance. *People v. McBride*, 228 P.3d 216, 227 (Colo.App.2009). Because all evidence of other bad acts could support a propensity inference, *Spoto* " 'does not demand the absence of the inference' but 'merely requires that the proffered evidence be logically relevant independent of that inference.' " *Id.* (quoting *People v. Snyder*, 874 P.2d 1076, 1080 (Colo.1994)). This requirement is met where there is "similarity" between the charged and uncharged acts, showing a "specific tendency" on the defendant's part. *Id.* (citing *Yusem v. People*, 210 P.3d 458, 466–67 (Colo.2009)). In contrast, a "lack of similarity" raises the risk that the other act "does not show a specific tendency that can be separated from the prohibited inference that [a defendant acted badly] in the past and therefore" must have committed the charged offense. *Id.* (quoting *Yusem*, 210 P.3d at 467).

¶ 32 Here, in its written order, as quoted above, the trial court found that the facts of the Cedar home incident and those in the present case were sufficiently similar to support admission of the evidence for the purpose of showing intent, modus operandi, and common plan.

¶ 33 We conclude the trial court did not abuse its discretion. The facts underlying the Cedar home incident and those supporting the charges here were similar because all

involved defendant's particular approach to burglarizing homes. Both incidents involved homes under renovation in which no one was living at the time. Both incidents occurred on weekends, when construction workers would not be present and the homes likely would be vacant. And, in both incidents, expensive construction tools were stolen. Moreover, the two incidents involved homes relatively close to each other, and the incidents took place within about two weeks of each other. *See People v. Ray*, 626 P.2d 167, 172 (Colo.1981) (concluding that evidence of subsequent burglaries was admissible to show common plan where the burglaries were "both temporally and geographically close," were committed during the daytime, and involved similar stolen items); *see also People v. Villa*, 240 P.3d 343, 350 (Colo.App. 2009) (court should consider the "interval of time between the acts"). Therefore, evidence of the Cedar incident showed that defendant had a "specific tendency" to target homes undergoing renovation, and thus was tied to the charged offenses with sufficient specificity that the evidence properly could be considered independently of the prohibited bad character inference. *See McBride*, 228 P.3d at 227.

¶ 34 Second, defendant argues that the third element of the *Spoto* test was not satisfied because the similarities between the two incidents are common to most burglaries. In making this argument, defendant relies on *People v. Jones*, —— P.3d ——, 2011 WL 3616006 (Colo.App.2011). Defendant's reliance on *Jones* is misplaced.

¶ 35 In *Jones*, a division of this court held that the trial court had abused its discretion in admitting prior acts of alleged sexual assault under CRE 404(b), where those prior acts "were not sufficiently similar to the alleged assault" charged in that case. *Id.* at ——. In reaching this conclusion, the division in *Jones* reasoned that the similarities between the other acts of alleged sexual assault and the alleged assault that had occurred in that case—specifically, that the victims were white and blonde, and had been sexually assaulted late at night after they had been drinking alcohol—were "common to many sexual assaults and not 'dissimilar from

the methods generally used in such an offense.' " *Id.* at —— (quoting *People v. Delgado,* 890 P.2d 141, 144 (Colo.App.1994)).

¶ 36 Contrary to defendant's argument, *Jones* is distinguishable from this case. Unlike the other acts at issue in *Jones,* the other act at issue here was dissimilar from the methods generally used in a burglary, making the other act relevant independent of the prohibited bad character inference. The other act evidence here showed that defendant targeted vacant homes under renovation, entered those homes on weekends, and took expensive construction tools. In our view, the other act evidence was specific, and, contrary to defendant's argument, dissimilar from a typical burglary. Moreover, unlike in *Jones,* the other act and the facts underlying the charged crime were remarkably similar, as discussed above. Therefore, we reject defendant's argument that *Jones* compels the conclusion that the other act evidence here was inadmissible.

¶ 37 Third, defendant contends that the trial court erred in admitting the other act evidence because the prosecution exploited the prohibited bad character inference during closing argument. The record refutes defendant's contention.

¶ 38 Contrary to defendant's arguments on appeal, the prosecution's remarks about the other act evidence in the closing argument were proper, and the prosecution specifically reminded the jury of the limited purposes for which the other act evidence could be considered:

When you go back and you are considering all of the evidence of what happened on August 26th you must consider that evidence in connection with this limiting instruction that the Judge has given to you. The instruction says you can consider it only for the limited purposes for which this evidence came in.

. . . .

August 26th can be considered in the [Stuart] case for establishing intent, modus operandi, common plan and common scheme.

¶ 39 Therefore, we conclude that the prosecution did not exploit the prohibited bad

character inference during closing argument, despite discussing the Cedar home incident at length.

¶ 40 Accordingly, the trial court did not abuse its discretion in admitting evidence of the Cedar home incident pursuant to CRE 404(b) for the limited purposes of showing intent, modus operandi, and common plan.

### IV. Sufficiency of the Evidence

¶ 41 Defendant contends the evidence was insufficient to support his conviction for second degree burglary of a dwelling. We disagree.

¶ 42 Whether the evidence was sufficient to sustain a conviction is a question of law that we review de novo. *Dempsey v. People,* 117 P.3d 800, 807 (Colo.2005).

¶ 43 A reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *People v. Sprouse,* 983 P.2d 771, 777 (Colo.1999); *People v. McIntier,* 134 P.3d 467, 471 (Colo.App. 2005). The prosecution must be given the benefit of every reasonable inference that might be fairly drawn from the evidence. *McIntier,* 134 P.3d at 471.

¶ 44 The determination of the credibility of witnesses is solely within the province of the fact finder, and it is the fact finder's function in a criminal case to consider and determine what weight should be given to all parts of the evidence and to resolve conflicts, testimonial inconsistencies, and disputes in the evidence. *Id.* An appellate court is not permitted to act as a fact finder and set aside a verdict because it might have drawn a different conclusion had it been the trier of fact. *Id.* at 471–72.

¶ 45 On appeal, defendant raises two contentions regarding the sufficiency of the evidence. First, he contends that the evidence was insufficient to show that he entered the Stuart home and, accordingly, that his conviction for second degree burglary should be reversed. Second, he contends that the evidence was insufficient to show that the Stuart home was a "dwelling." Accordingly,

he argues that his conviction for second degree burglary of a dwelling, a class 3 felony, should be vacated and his case remanded to the trial court for entry of judgment for second degree burglary, a class 4 felony, and resentencing. We reject both of defendant's sufficiency of the evidence contentions.

### A. Entry

¶ 46 As pertinent here, the crime of second degree burglary requires an "entry" into a "building" or "occupied structure." § 18–4–203(1), C.R.S.2011; *see also People v. Esquibel,* 794 P.2d 1065, 1066 (Colo.App. 1990) (an "unlawful entry" is an element of the crime of second degree burglary). The second degree burglary statute provides, in relevant part:

A person commits second degree burglary, if the person knowingly breaks an entrance into, enters unlawfully in, or remains unlawfully after a lawful or unlawful entry in a building or occupied structure with intent to commit therein a crime against another person or property.

§ 18–4–203(1).

¶ 47 Here, evidence at trial established that the cigarette butt found in the kitchen of the Stuart home contained DNA matching defendant's DNA. Moreover, after defendant was arrested in connection with the incident at the Cedar home, the police found several tobacco products in defendant's car: a pouch of loose cigarette tobacco, cigarette rolling papers, and hand-rolled cigarette butts, similar to the one found in the kitchen of the Stuart home. Further, testimony at trial established that only Cheek and his business partner went into the Stuart home during the renovation project in the weeks leading up to the burglary, and Cheek was the only person working in the home on Friday, August 11. Cheek further testified that he thoroughly cleaned all of the floors in the house (including the kitchen) that day before he left for the weekend, and that there were no cigarettes on the floor anywhere in the house on that day. The burglary took place over the weekend, and Cheek discovered the tools were missing when he returned to the home on Monday, August 14. He found defendant's hand-rolled cigarette butt on the

kitchen floor on Thursday, August 17, as he was starting to clean up to do trim work in the kitchen. Contrary to defendant's contention, the jury could have reasonably concluded from this evidence that defendant's cigarette butt was not tracked into the Stuart home accidently by anyone else.

¶ 48 Evaluating the evidence in its totality and in the light most favorable to the prosecution, we conclude that it was sufficient to allow the jury to conclude that defendant entered the Stuart home. *See Sprouse,* 983 P.2d at 777.

### B. "Dwelling"

¶ 49 Defendant next contends that the evidence was insufficient to show that the Stuart home was a "dwelling" within the meaning of the statutory definition of that term. We disagree.

¶ 50 When the sufficiency of the evidence is challenged on appeal, the reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *Id.* Here, defendant's sufficiency of the evidence contention turns on a question of statutory interpretation. Statutory interpretation is a question of law that we review de novo. *Bostelman v. People,* 162 P.3d 686, 689 (Colo. 2007).

¶ 51 When interpreting a statute, we must give effect to the intent of the General Assembly, which is vested with the power to define criminal conduct and to establish the legal components of criminal liability. *People v. Hoskay,* 87 P.3d 194, 197–98 (Colo.App. 2003). To determine the General Assembly's intent, we look first to the language of the statute itself, giving words and phrases their plain and ordinary meaning. *People v. Rice,* 198 P.3d 1241, 1244 (Colo.App.2008). We read words and phrases in context and construe them according to their common usage. *Id.* "[W]e must read and consider the statutory scheme as a whole to give consistent, harmonious and sensible effect to all its parts." *People v. Luther,* 58 P.3d 1013, 1015 (Colo.2002) (quoting *Charnes v. Boom,* 766

P.2d 665, 667 (Colo.1988)). If the statutory language is clear and unambiguous, we do not engage in further statutory analysis and apply the statute as written. *Bostelman,* 162 P.3d at 690; *People v. Witek,* 97 P.3d 240, 243 (Colo.App.2004).

### 1. Analysis

¶ 52 The burglary statute provides, in relevant part:

A person commits second degree burglary, if the person knowingly breaks an entrance into, enters unlawfully in, or remains unlawfully after a lawful or unlawful entry in a building or occupied structure with intent to commit therein a crime against another person or property.

§ 18–4–203(1). "Building" is defined in section 18–4–101(1), C.R.S.2011, as follows:

"Building" means a structure which has the capacity to contain, and is designed for the shelter of, man, animals, or property, and includes a ship, trailer, sleeping car, airplane, or other vehicle or place adapted for overnight accommodations of persons or animals, or for carrying on of business therein, whether or not a person or animal is actually present.

It is not disputed that the Stuart home was a "building."

¶ 53 Second degree burglary is normally a class 4 felony, but it is elevated to a class 3 felony if the burglary is of a "dwelling." § 18–4–203(2)(a), C.R.S.2011. "Dwelling" is defined in section 18–1–901(3)(g), C.R.S.2011, as follows:

"Dwelling" means a building which is used, intended to be used, or usually used by a person for habitation.

¶ 54 Burglary of a dwelling is a sentence enhancement provision defining the level of punishment for a particular type of second degree burglary. It is not an element of a distinguishable offense for purposes of determining whether second degree burglary is a lesser included offense of first degree burglary. *Armintrout v. People,* 864 P.2d 576, 579–80 (Colo.1993).

¶ 55 The record shows that Cheek purchased the Stuart home from a woman who had lived there, with her family and on her own, for about thirty-five years. Cheek testified that he planned on renovating the home and selling it for a profit. Specifically, Cheek planned to replace the roof, windows, and siding, remodel the kitchen and bathrooms, and refinish the hardwood floors. At the time of the burglary, Cheek and his business partner were in the process of demolishing the interior of the Stuart home and refinishing the hardwood floors. They had torn out the kitchen cabinets, moved the kitchen appliances, ripped up the carpeting, demolished a bathroom, taken out a fireplace, and removed ceiling tile, baseboards, trim, and several doors, among other things.

¶ 56 Defendant argues that the Stuart home was not a "dwelling" within the meaning of sections 18–4–203(2)(a) and 18–1–901(3)(g) because the home was uninhabited at the time of the burglary, was being "professionally remodeled" at the time, and was "nothing more than a construction site." Therefore, defendant contends that the evidence was insufficient to support his conviction for second degree burglary of a "dwelling," a class 3 felony, and that his conviction should be reduced to second degree burglary, a class 4 felony, and his case remanded to the trial court for resentencing.

¶ 57 Whether the term "dwelling" encompasses existing homes under renovation is an issue of first impression in Colorado. We conclude that the plain language of the statutory definition of the term "dwelling" compels the conclusion that a "dwelling" encompasses homes under renovation that are "intended to be used" for habitation in the future. This interpretation is also consistent both with Colorado case law that has given an expansive interpretation to the term "dwelling" and with persuasive out-of-state authority construing similar statutory language.

¶ 58 We first turn to an analysis of the plain language of the statute. Defendant contends that the phrases "intended to be used" and "usually used" in the statutory definition of "dwelling" refer only to structures, such as vacant homes and mobile homes, that are "generally used for habitation and in fact can be used for habitation."

Accordingly, defendant argues, homes undergoing renovation are not "dwellings" because they cannot, at present, be used for habitation. In contrast, the People argue that the phrase "intended to be used" includes future use in addition to present use, and, therefore, existing homes undergoing renovation are "dwellings," provided they are intended to be used for habitation. We agree with the People.

¶ 59 Under section 18–1–901(3)(g), "dwelling" means "a building which is used, *intended to be used,* or usually used by a person for habitation." § 18–1–901(3)(g) (emphasis added). A "dwelling," according to the definition, is also necessarily a "building." "Building," in turn, means a "structure which has the capacity to contain, and *is designed for the shelter of,* man, animals, or property ... *whether or not a person or animal is actually present.*" § 18–4–101(1) (emphasis added). Therefore, under the plain language of the statute, a "dwelling" is a structure "designed for the shelter of" persons and "which is used, intended to be used, or usually used" for habitation "whether or not a person ... is actually present."

¶ 60 Contrary to defendant's contention, the words "intended to be used" for habitation cannot be interpreted to refer only to structures that are "generally used for habitation and in fact can be used for habitation." Such an interpretation would render the phrase "usually used for habitation" superfluous, because the phrase "usually used" describes the normal use of a building, and we must avoid statutory constructions that render statutory provisions a nullity. *See* § 2–4–201(1)(b), C.R.S.2011 ("The entire statute is intended to be effective."); *Luther,* 58 P.3d at 1015. Similarly, defendant's interpretation would also render superfluous the provision making clear that a "dwelling" is necessarily a "building," because the definition of "building" includes a structure "designed for the shelter of" persons "whether or not a person ... is actually present." *See People v. Cross,* 127 P.3d 71, 74 (Colo.2006) (in interpreting statutory provisions, court should construe "each consistently and in harmony with the overall statutory design").

¶ 61 Additionally, the plain meaning of the phrase "intended to be used" includes a future use, in addition to a present use. *See Rice,* 198 P.3d at 1244 (courts must give words and phrases their plain and ordinary meanings); *see also Bartlett's Roget's Thesaurus*

¶ 62 § 650.6 (Little, Brown & Co. 1996) (listing "to be" as a synonym of "future," along with other synonyms, such as "forthcoming," "upcoming," "yet to be," "eventual," and "destined"). Thus, defendant's contention that the phrase "intended to be used" refers only to a structure that can "presently be used as a dwelling" ignores the plain meaning of the statutory language, and, in interpreting statutes, we must give phrases their ordinary and plain meaning. *See Rice,* 198 P.3d at 1244.

¶ 63 Our plain language interpretation of the term "dwelling" is, at least indirectly, supported by case law that has consistently provided an expansive interpretation of Colorado's burglary statutes.

¶ 64 Under the common law, burglary was defined as breaking and entering the dwelling house of another at night with the intent to commit a felony therein. *See Cooper v. People,* 973 P.2d 1234, 1237–38 (Colo.1999); *People v. Fuentes,* 258 P.3d 320, 323 (Colo. App.2011). In *Cooper,* the court noted that, at common law, the crime of burglary developed to combat what was seen as a "very heinous offence," namely, the "forcible invasion and disturbance of [the] right to habitation." *Cooper,* 973 P.2d at 1237 (quoting 4 William Blackstone, *Commentaries* 282 (Hammond ed. 1890)). The crime's purpose, therefore, "was to deter trespass 'against habitations,' as opposed to mere property interests." *Fuentes,* 258 P.3d at 323–24 (quoting *Cooper,* 973 P.2d at 1238). Thus, common law burglary can be understood as a crime primarily concerned with protecting persons as opposed to property interests. *Id.* at 324.

¶ 65 The statutory definition of burglary in Colorado, however, does not reflect these same concerns. *Id.* In light of this expansive definition, Colorado courts have consistently declared that burglary is "an offense against property and not merely against the habi-

tation." *Sloan v. People,* 65 Colo. 456, 457, 176 P. 481, 482 (1918); *see Cooper,* 973 P.2d at 1238; *Fuentes,* 258 P.3d at 324.

¶ 66 The supreme court has interpreted the meaning of the term "dwelling" only once and, in so doing, has given it an expansive meaning. In *People v. Jiminez,* 651 P.2d 395 (Colo.1982), the court considered whether an attached garage could be considered a "dwelling." The court concluded that it was, reasoning as follows:

> The statutory definition of dwelling comprehends an entire building. There is no room in the language of that clearly worded statute to exclude from the meaning of dwelling those parts of a residence that are not "usually used by a person for habitation." Moreover, at least some of the usual uses of a residential garage, including storage of household items, are incidental to and part of the habitation uses of the residence itself.

*Id.* at 396. Decisions by divisions of this court considering the meaning of "dwelling" have also given the term a similarly expansive interpretation. *See People v. Nichols,* 920 P.2d 901, 902 (Colo.App.1996) (jail cell a "dwelling" because it is used by persons for habitation); *People v. Germany,* 41 Colo. App. 304, 308, 586 P.2d 1006, 1009 (1978) (hospital room a "dwelling" because it is usually used as a place where persons sleep), *rev'd on other grounds,* 198 Colo. 337, 599 P.2d 904 (1979).

¶ 67 Although the issue here is one of first impression in Colorado, courts in other states have addressed similar issues.

¶ 68 In *People v. Silva,* 256 Ill.App.3d 414, 195 Ill.Dec. 484, 628 N.E.2d 948, 949 (1993), the defendant was convicted of residential burglary. On appeal, Silva argued, as defendant does here, that his conviction for residential burglary should be reduced to burglary because the burglarized structure was not a "dwelling" within the meaning of the applicable statutory definition. *Id.* In Illinois, "dwelling" means a "building or portion thereof . . . which is used or intended for use as human habitation, home or residence." *Id.* at 950 (quoting 720 Ill. Comp. Stat. 5/2–6(a)). In applying this definition, the court in *Silva* concluded that "the burglary of the

unoccupied first-floor and garden apartments undergoing renovation in this case was a residential burglary under the definition of 'dwelling.' " *Id.* at 952. The court reasoned that evidence at trial showed that the owner-developer of the building intended either to live in the space he was renovating or to rent the space to a tenant who would move into the space. *Id.; see also People v. Dorris,* 265 Ill.App.3d 156, 202 Ill.Dec. 633, 638 N.E.2d 279, 281 (1994) (holding that a housing unit undergoing construction and renovation qualified as a dwelling, because the owner intended it to be used as a residence upon completion of the construction, and also holding that the fact that "the building happened to be vacant at the time of the offense is merely a fortuitous circumstance"). Accordingly, the court in *Silva* affirmed the trial court's finding that the apartments undergoing renovation were "dwellings" because they were being prepared for residential use. *Silva,* 195 Ill.Dec. 484, 628 N.E.2d at 952.

¶ 69 We find this reasoning persuasive and applicable here. Like the statutory definition of "dwelling" in Illinois, the statutory definition of "dwelling" in Colorado also contains language encompassing structures "intended to be used" as habitations. And, like the apartments in *Silva,* there is ample evidence in the record here that the Stuart home was intended to be used as a place for habitation, given that Cheek purchased the Stuart home to renovate it and make it *more* habitable, including remodeling the kitchen and bathrooms, refinishing the hardwood floors, and replacing windows and doors.

¶ 70 The out-of-state cases relied on by defendant are either distinguishable, not persuasive, or both.

¶ 71 For example, in *Munoz v. State,* 937 So.2d 686 (Fla.Dist.Ct.App.2006), a division of the Florida district court of appeals considered whether a house under renovation qualified as a "dwelling." In Florida, "dwelling" means:

> [A] building or conveyance of any kind, including any attached porch, whether such building or conveyance is temporary or permanent, mobile or immobile, *which has a roof over it and is designed to be*

*occupied by people lodging therein at night,* together with the curtilage thereof. *Id.* at 688 (emphasis in *Munoz* ) (quoting Fla. Stat. § 810.011(2) (2006)). In construing this definition, the majority in *Munoz* relied on *Perkins v. State,* 682 So.2d 1083 (Fla.1996), and, specifically, the following pertinent language from that case:

> Occupancy is no longer a critical element under this [statutory] definition. Rather, it is the design of the structure or conveyance which becomes paramount. *If a structure or conveyance initially qualifies under this definition, and its character is not substantially changed or modified to the extent that it becomes unsuitable for lodging by people, it remains a dwelling irrespective of actual occupancy.*

*Munoz,* 937 So.2d at 688 (emphasis in *Munoz* ) (quoting *Perkins,* 682 So.2d at 1084). Relying on the highlighted language above, the majority reasoned that, to qualify as a "dwelling," a structure must be designed for human habitation, and, additionally, it also must not be substantially changed to the extent that it becomes unsuitable for habitation. *Id.*

¶ 72 The majority then analyzed the burglarized house in *Munoz,* characterizing it as a "construction site" and noting that the house had been outfitted with "temporary power," contained a "minifridge," an "old microwave," and "stacks of garbage, buckets, and work supplies." *Id.* at 689. Accordingly, because the house was not "suitable for lodging by any stretch of the imagination," the majority concluded that the house was not a "dwelling" within the meaning of the statutory definition, in light of the Florida Supreme Court's interpretation of that term in *Perkins. Id.*

¶ 73 However, we are more persuaded by the well-reasoned dissent in *Munoz,* which emphasized that the majority's analysis was inconsistent with the plain language of the statute, requiring only that a "dwelling" be "designed" for habitation. *Id.* at 690 (Canady, J., dissenting). Further, the dissent argued that the majority had misread *Perkins,* which made clear that, in determining whether a structure qualified as a "dwelling," "it is the design of the structure" that is "para-

mount." *Id.* at 691 (quoting *Perkins,* 682 So.2d at 1084). Therefore, because the use of the home in *Munoz* for which it was designed—human habitation—had not been altered, the dissent concluded that the home was a "dwelling," despite its temporary transformation into an uninhabitable structure during the process of renovation. *Id.*

¶ 74 We find the reasoning of the dissent in *Munoz* persuasive and applicable here. The dissent interpreted the term "dwelling," which includes structures "designed to be occupied by people," to encompass structures rendered temporarily uninhabitable by renovation. Similarly, the definition of "dwelling" in Colorado includes, in our view, temporarily uninhabitable buildings under renovation, provided such buildings are "intended to be used" for habitation. *See* § 18–1–901(3)(g); *Munoz,* 937 So.2d at 690 (Canady, J., dissenting). The "intended" use of a building, like a structure's "design," does not change during renovation, provided the building is still "intended to be used" for habitation.

¶ 75 Indeed, other Florida District Court of Appeals opinions, in confronting the same issue addressed in *Munoz,* have disagreed with the *Munoz* majority and have instead expressly adopted the reasoning of the dissent in that case. *See Michael v. State,* 51 So.3d 574, 575 (Fla.Dist.Ct.App.2010); *see also Young v. State,* 73 So.3d 825 (Fla.Dist. Ct.App.2011) (affirming defendant's burglary conviction and certifying conflict with *Munoz* ).

¶ 76 The other out-of-state cases relied on by defendant are similarly unpersuasive and distinguishable, either because the statutory language at issue is different from Colorado's or the facts are different from this case. *Cf. Weeks v. State,* 274 Ga.App. 122, 616 S.E.2d 852, 854 (2005) (distinguishable because Georgia's definition of "dwelling" does not include the language "intended to be used" in Colorado's definition of the term "dwelling"); *State v. Alvis,* 30 Kan.App.2d 889, 53 P.3d 1232, 1234 (2002) (concluding that a house that had *never* been occupied was not a "dwelling"); *Carr v. State,* 770 So.2d 1025, 1029 (Miss.Ct.App.2000) (holding that, under Mississippi's common law definition of "dwelling," a structure "must be in present

use as a residence for someone," and a structure could not be a dwelling where there was no evidence that the structure was being used as a residence or was intended to be so used in the future); *State v. McNearney,* 246 P.3d 532, 533–35 & n. 5 (Utah Ct.App.2011) (concluding that a recently constructed but yet-unoccupied house was not a "dwelling," because the house had *never* been occupied; the court stated expressly it was not addressing situations where "a house has been occupied in the past but, for whatever reason, has become unoccupied by the time it is burglarized"); *Johns v. Commonwealth,* 53 Va.App. 742, 675 S.E.2d 211, 214–15 (2009) (construing a definition of "dwelling" different from Colorado's statute, and concluding that a house under renovation was not a "dwelling," because the owner-developer did not intend to live or sleep there, and the record contained no evidence that the house was "used for habitation").

### 2. Application

¶ 77 Given our interpretation of the term "dwelling" above, we now turn to whether the evidence was sufficient to show that the Stuart home was "intended to be used" for habitation. We conclude that it was.

¶ 78 At trial, Cheek, the owner of the Stuart home, testified that he was a developer who purchased homes, renovated them, and sold them for a profit. Specifically regarding the Stuart home, Cheek testified that he planned to replace, and was in the process of replacing, the roof, windows, and siding, was remodeling the kitchen and bathrooms, and was refinishing the hardwood floors throughout the home at the time of the burglary. Therefore, according to Cheek, he was renovating the Stuart home to make it *more* habitable, despite its condition at the time of the burglary. Moreover, although not essential to our holding, testimony at trial established that the previous owner of the Stuart home had lived there with her family for about thirty-five years, making it objectively clear that the Stuart home had historically been intended for use as a habitation as well.

* Furman, J., would grant.

¶ 79 Therefore, we conclude that the evidence was sufficient to show that the Stuart home was a "dwelling" within the meaning of the statutory definition of that term.

¶ 80 The judgment is affirmed.

Judge TERRY and Judge RICHMAN concur.