QUINCE, J.
Eric M. Young was charged by information in Orange County with four offenses: burglary of a dwelling, robbery with a firearm, carjacking with a firearm and possession of a firearm by a convicted felon. A jury found Young guilty of the lesser included offenses of (1) burglary of a dwelling with an assault or battery with a dangerous weapon; (2) robbery with a weapon; and (3) carjacking with a dangerous weapon.[1] Young was sentenced to twenty years in prison for each conviction, to all run concurrently with the sentence that he was already serving for other unrelated crimes.
Young appealed his convictions to the Fifth District Court of Appeal, which affirmed his convictions for burglary of a dwelling and carjacking. Young v. State, 73 So.3d 825 (Fla. 5th DCA 2011). The Fifth District certified conflict with Munoz v. State, 937 So.2d 686 (Fla. 2d DCA 2006) on the issue of whether Florida’s burglary statute requires a structure to be suitable for habitation, on the date of the offense, for the structure to meet the definition of a dwelling.[2] Id. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
The Fifth and Second Districts disagree as to whether a structure undergoing substantial renovations constitutes a “dwelling” under section 810.011(2), Florida Statutes (2009). Young also seeks this Court’s discretionary jurisdiction citing a conflict with the Third District’s decision in Flores v. State, 853 So.2d 566 (Fla. 3d DCA 2003), as to whether a defendant can be convicted of carjacking where the force used in the robbery on the inside of the building is separate from the taking of the vehicle on the outside of the building. For the reasons that follow, we conclude that the building in question constitutes a dwelling under section 810.011(2), Florida Statutes (2009) and approve the Fifth District’s denial of relief. We further conclude that Young’s actions constitute a carjacking under section 812.133, Florida Statutes (2009). We disapprove the decision of the *164 Second District in Munoz and the Third District in Flores to the extent that they are inconsistent with this opinion.
STATEMENT OF THE CASE AND FACTS
On October 1, 2009, Petitioner Eric M. Young was charged by information with four offenses: (1) burglary of a dwelling; (2) robbery with a firearm; (3) carjacking with a firearm; and (4) possession of a firearm by a convicted felon. The information alleged that, on September 6, 2009, Young entered a dwelling where the victim was located with the intent to commit an offense therein and that in the course of committing said offense, did make an assault or battery upon the victim, actually possessed a firearm or destructive device, and did carry, display, use, threaten to use or attempted to use a firearm, in violation of sections 810.02(l)(b)l, 810.02(2)(a), 775.087(1) and 775.087(2), Florida Statutes (2009). The information further alleged that Young took certain property from the victim, in violation of sections 812.13(2)(a) and 775.087(2), Florida Statutes (2009); that he took the victim’s motor vehicle by force, violence, assault or putting in fear, in violation of sections 812.133(1), 812.133(2)(a) and 775.087(2), Florida Statutes (2009); and that he did have in his care, custody, control or possession a firearm, after previously being convicted of a felony in violation of section 790.23, Florida Statutes (2009).
The victim testified at trial that he owns his own drywall texture business. At approximately 8:00 p.m. on the night of September 6, 2009, he was cutting drywall “in the kitchen/dining room/living room area” of a house that he had been hired to renovate. He stated that he had been working on the house for approximately a week and a half and that once he finished cutting the drywall that night, his task would be complete. No other workers were present in the house that night. While on the floor cutting drywall, the victim heard a voice and looked up to see a man walking toward him with a gun, saying “Don’t look at me.” Young then said “Where’s it at? Give it to me. You know where it’s at.” Young proceeded to reach into the victim’s pockets and removed the victim’s cell phone, keys and wallet. The victim stated that there was an accomplice outside with his shirt pulled over his head who quickly walked in, looked around and walked out. The victim watched the perpetrators leave in the victim’s truck and immediately ran to a neighboring house to call 911.
Patrol Officer Brandon Bottom of the Orlando Police Department testified at trial that on September 8, 2009, he attempted to pull over Young, who was driving the victim’s white Ford truck, after he failed to stop at two stop signs. Young immediately accelerated to a high rate of speed but was eventually apprehended. Thereafter, the officer ran the license tag number of the truck and learned that the truck was reported stolen. Young was taken to jail.
Approximately four days after the robbery, the victim identified Young as the perpetrator in a photo lineup. That same day, the victim was able to retrieve his truck from the impound. The victim stated that when his truck was returned to him, it was in the same condition as the last time he saw it before the robbery, except that the truck previously had a quarter of a tank of gas and upon return, the gas tank was nearly empty. He also stated that all of his tools were accounted for and his wallet was also in the back seat of the car with all of the checks and credit cards still present. There were no unauthorized charges to the victim’s credit cards and no money was missing from his *165 bank account. The victim’s cell phone was never recovered.
ANALYSIS
These facts present two issues to be resolved by this Court. The first issue is whether the trial court erred in finding Young guilty of burglary of a dwelling where the building in question was undergoing renovations and, arguably, not suitable for lodging. This is the subject of the certified conflict between the decision under review and the Second District’s decision in Munoz v. State, 937 So.2d 686 (Fla. 2d DCA 2006). The second issue is whether the trial court erred in finding Young guilty of carjacking, where the force used in the robbery occurred inside of the building and the taking of the car occurred outside of the building. Young presented the carjacking issue to this court, citing express and direct conflict with the Third District’s decision in Flores v. State, 853 So.2d 566 (Fla. 3d DCA 2003).
Fundamental Error
At the close of the State’s case the defense moved for a judgment of acquittal, claiming that the State had not proven all of the elements needed for pri-ma facie cases of burglary, robbery and carjacking. The defense did not elaborate on the basis for the motion in relation to the burglary and robbery charges, but went on to state that there was no evidence that the car was taken from the custody of the victim as required by the carjacking statute. In Brooks v. State, 762 So.2d 879, 895 (Fla.2000), this Court determined that a “technical and pro-forma” motion which requests a judgment of acquittal without further argument is “totally inadequate to preserve a sufficiency of the evidence claim for appellate review.” A defendant must preserve a claim of insufficiency of the evidence through a timely challenge in the trial court. F.B. v. State, 852 So.2d 226, 230 (Fla.2003). The motion or objection must be specific in order to preserve the claim for appellate review. Id. at 230 n. 2. A boilerplate objection or motion is inadequate. Id.
There are two exceptions to the requirement that a timely objection be made to the trial court: (1) where the defendant is sentenced to death; and (2) where the evidence is insufficient to show that a crime was committed at all. Id. at 230. As to the second exception, if the defendant is convicted of a crime where the evidence does not demonstrate that a crime has been committed at all, this constitutes a fundamental error, an error that “reaches to the foundation of the case and is equal to a denial of due process,” and therefore need not be preserved at trial. Id. at 230-31. Young claims that the fundamental error exception applies in this case. However, the evidence presented suggests, at the least, that Young committed a burglary of a structure. It is a question of fact for the jury whether the structure qualifies as a dwelling. As the evidence indicates that a crime was in fact committed by Young, Young’s conviction cannot be said to be fundamental error. Therefore, any specific issue that Young would like to address on appeal must have been preserved at the trial level. Because Young did not specifically argue at trial that the building was not a “dwelling,” this claim was not properly preserved and has been waived. Further, as explained below, addressing the merits of this claim, Young has not established that the trial court erred.
Burglary of a Dwelling
Florida’s burglary statute, section 810.011, defines dwelling as:
a building or conveyance of any kind, including any attached porch, whether such building or conveyance is tempo *166 rary or permanent, mobile or immobile, which has a roof over it and is designed to be occupied by people lodging therein at night, together with the curtilage thereof. However, during the time of a state of emergency ... the term includes such portions or remnants thereof as exist at the original site, regardless of absence of a wall or roof.
§ 810.011(2), Fla. Stat. (2007) (emphasis added). In Perkins v. State, 682 So.2d 1083, 1083 (Fla.1996), this Court determined that pursuant to chapter 810, Florida Statutes, a structure’s design or suitability for habitation, rather than actual occupancy or intent to occupy, controls in determining whether a structure constitutes a dwelling. In reaching this conclusion, this Court approved the reasoning and analysis of the First District, as to how the burglary statute differs from the common law definition of “dwelling”:
Occupancy is no longer a critical element under this [statutory] definition. Rather, it is the design of the structure or conveyance which becomes paramount. If a structure or conveyance initially qualifies under this definition, and its character is not substantially changed or modified to the extent that it becomes unsuitable for lodging by people, it remains a dwelling irrespective of actual occupancy. It is, therefore, immaterial whether the owner of an unoccupied dwelling has any intent to return to it.
Id. at 1084 (quoting in Perkins v. State, 630 So.2d 1180, 1181-82 (Fla. 1st DCA 1994)). This Court went on to state that “[i]t is apparent here that the legislature has extended broad protection to buildings or conveyances of any kind that are designed for human habitation. Hence, an empty house in a neighborhood is extended the same protection as one presently occupied.” Id. at 1085. Florida district courts of appeal have disagreed as to the application of this Court’s rule in Perkins. This Court has under review Young v. State, 73 So.3d 825 (Fla. 5th DCA 2011), where the Fifth District affirmed Young’s conviction for burglary of a dwelling, where the crime was committed inside of a house undergoing renovations. The Fifth District certified conflict with Munoz v. State, 937 So.2d 686 (Fla. 2d DCA 2006).

Munoz v. State

In Munoz, the Second District held that a house which had been “gutted” so that it could be restored and sold no longer qualified as a “dwelling.” The Second District reasoned that the legislature specifically protected houses made unsuitable for lodging during emergencies, and did not provide that same protection for houses unsuitable for lodging for other reasons, such as reconstruction or renovations. Id. at 689. The court also concluded that the state of emergency exception only made sense in relation to Perkins if a structure is required to be both designed for lodging by people and suitable for lodging by people in order to qualify as a dwelling. Id. Accordingly, the Second District determined that the “massive reconstruction” taking place in the house made it unsuitable for lodging, and therefore, it was not a dwelling. Id. at 689. In Munoz, the Second District departed from its previous decision in State v. Bennett, 565 So.2d 803 (Fla. 2d DCA 1990), where it concluded that “as long as a structure is ‘ “designed” for eventual human habitation,’ it qualifies as a dwelling.” Munoz v. State, 937 So.2d at 688 (quoting State v. Bennett, 565 So.2d 803, 805 (Fla. 2d DCA 1990)).
The dissent in Munoz asserted that the Munoz majority misread Perkins. Id. at 690 (Canady, J., dissenting). The dissent contended that the rationale employed in Bennett should have controlled the decision, as the Bennett rationale can be read in accordance with this Court’s decision in *167 Perkins. Id. The dissent argued that “the designed use of a structure denotes the purpose for which the structure is eventually intended to be used” and that this designed use “is not changed by transitory circumstances — such as a major renovation project — that render the premises temporarily uninhabitable.” Id. As to this Court’s requirement in Perkins that the character of the structure not be substantially modified to the extent that it becomes unsuitable for lodging, the dissent explained that this requirement prohibits the purpose for which the structure is designed from being altered, such as when a residential structure is converted to a commercial or other non-residential use. Id. at 691 (citing Perkins, 682 So.2d at 1084). The dissent further opined that the state of emergency exception to the statute is necessary to ensure that a house that collapses or loses its roof during a state of emergency remains within the definition of a dwelling, despite the fact that it may no longer be considered a building. Id. at 692. The dissent contended that this exception also ensures that dwellings damaged during a state of emergency do not lose the protection of the penalties for burglary of a dwelling; this is evidenced by the history of the burglary statute which demonstrates legislative purpose to expand the coverage of the statute, not to restrict it as done by the majority in Munoz. Id.
As further explained below, we conclude that the dissent in Munoz provides the proper explanation of the legislative intent regarding section 810.011(2). As this Court has already stated, it is the character and purpose of the house that determines its status as a dwelling. Perkins, 682 So.2d at 1084. In Perkins, this Court also recognized that section 810.011(2) must be given its plain and obvious meaning unless a literal interpretation would produce an unreasonable or ridiculous result. Id. at 1085. It appears that the plain and obvious meaning of this statute can be ascertained, without producing an unreasonable conclusion. The plain meaning of the statute indicates an intent for the state of emergency exception to apply to the portion of the statute requiring a roof, not the portion requiring a certain “design.” See § 810.011(2), Fla. Stat. (2009) (“[DJuring the time of a state of emergency ... the term includes such portions or rémnants thereof as exist at the original site, regardless of absence of a wall or roof”) (emphasis added). The plain language of the statute indicates a legislative intent to protect the “dwelling” status of a house that is destroyed during a state of emergency, despite the fact that the roof no longer exists. This reading of the statute does not remove the requirement that the intended purpose or character of the building be that “designed to be occupied by people lodging therein at night.” Id. See § 810.011(2), Fla. Stat. (2009). This reading of the statute also effectuates the legislative intent without the need of adding an additional element not explicitly stated in the statute.

Suitable for Lodging by People

The key issue in the conflict between the Second District in Munoz and the Fifth District in this case, is the question of what qualifies as a “substantial change” that would render a home “unsuitable for lodging by people.” The dispute rests on the decision of whether the character of the building and suitability for human lodging are more synonymous with appearance or more synonymous with the purpose of the structure. The Munoz court seems to conclude that “suitable for lodging by people” refers to the appearance that the building is prepared for immediate habitability. See Munoz, 937 So.2d at 689 (concluding that the home in Perkins, which was furnished and regular *168 ly maintained by the owner was suitable for lodging, and that the home in Munoz, which was under construction and missing interior walls, sheetrock and insulation, was not suitable for lodging “by any stretch of the imagination.”).
In Perkins, this Court recognized suitability for lodging by people as relating to the “character” of the structure. See Perkins, 682 So.2d at 1084 (“If a structure ... initially qualifies [as a dwelling], and its character is not substantially changed or modified to the extent that it becomes unsuitable for lodging by people, it remains a dwelling ....)”; see also Ratliff v. State, 668 So.2d 1090, 1090 (Fla. 1st DCA 1996) (holding that a newly built but unoccupied home constituted a dwelling under Florida’s burglary statute). The word “substantially” used by this Court in the Perkins decision, seems to have created a sliding scale of the characteristics which define a dwelling, with the house described in Perkins being an example of one undergoing renovations which was suitable for lodging and the house described in Munoz being an example of one undergoing renovations that is not suitable for lodging, with all other examples falling somewhere within this spectrum. In Perkins, the burglarized house had been maintained by the owner, although it had been unoccupied for several months prior to the burglary. Perkins, 682 So.2d at 1084. The owner periodically rented the home and hoped to rent or sell it in the future “for someone to live in.” Id.
On the day of the burglary, the house contained various items of personalty, including a stove, refrigerator, washer, microwave, and assorted items in the closets and cabinets. The telephone had been disconnected and the water turned off, but the electricity was on and well water was available on the property. The owner last visited the house three to four weeks before the burglary when he mowed the grass and picked up trash.
Id. In a split decision, the First District held that this constituted a dwelling within the meaning of the burglary statute. Id. This Court concluded that the burglarized house was “designed to be occupied by people lodging therein at night,” and that the owner intended it to be used for that purpose. Id.
In Munoz, the Second District determined that the burglarized house was “not a dwelling by any stretch of the imagination” where the house had been “gutted” and was being “rework[ed] from the ground up.” 937 So.2d at 687, 689. The court described the house as a “construction site” as the electricity was temporary and “for construction purposes only” and the indoor plumbing was not in use. Id. at 687. The house had wires hanging from the ceiling, unfinished flooring and “a piece of plywood” acting as the back door. Id. Although this house was intended for “eventual human habitation,” the court determined that the condition of the house made it unsuitable for lodging by people at the time of the burglary.
However, in Michael v. State, 51 So.3d 574 (Fla. 5th DCA 2010), the Fifth District considered a house that had been occupied as a dwelling in the recent past, had an intact roof, was secured with windows and insulation but “was undergoing interior renovations that rendered it temporarily uninhabitable.” Id. at 575, 576. In holding the house to be a dwelling, the court acknowledged that in its current state it was unsuitable to be occupied by people for lodging. Id, at 575. The Fifth District agreed with the “well-reasoned dissent in Munoz” that there is no additional requirement that the structure be habitable as a dwelling on the date of the offense. Id.
*169 And, in Jacobs v. State, 41 So.3d 1004 (Fla. 1st DCA 2010), the First District held that the evidence presented was sufficient to create a jury question as to whether a house was suitable for lodging, and thus remained a dwelling during a time of renovation. Id. at 1007. The burglarized house was a family home before it was ruined by a fire twelve years before the burglary. Id. at 1005. In the twelve-year period, no one lived in the house but the owner was slowly renovating the house. Id. The house had a roof over it, had floors and walls, was designed to be occupied by people and was so occupied prior to the fire. Id. at 1006. The house was equipped with plumbing and electric utilities which were turned off because the house was unoccupied. Id. The court concluded that there was competent, substantial evidence to support the status of the house as a “dwelling,” and that there was no evidence that the interior of the house was in a state of ruin comparable to that described in Munoz. Id. at 1007.
The Third District in Gonzalez v. State, 724 So.2d 126, 127 n. 1 (Fla. 3d DCA 1998), without addressing this Court’s language in Perkins, noted that a home under construction but nearing completion qualified as a “dwelling.” The Munoz court alleged that this statement is dicta because the question of whether a home under construction was a dwelling was not at issue in Gonzalez. See Munoz, 937 So.2d at 688. The Fourth District in Anderson v. State, 831 So.2d 702, 703 (Fla. 4th DCA 2002), agreed that the Third District’s language in Gonzalez was dicta, while noting that the Fourth District “do[es] not necessarily agree with that dicta.” Id. at 703. In Anderson, the burglarized home was being remodeled in order to make it larger. Id. The defendant entered an incomplete addition to the residence, which was separated from the home where the victim lived by a temporary wall. Id. This incomplete addition contained no access to the other part of the house, had walls and a roof, but no door or windows. Id. The Fourth District affirmed the burglary conviction based on the fact that the addition, although not yet habitable, was a part of the curtilage, and therefore a part of the dwelling. Id.; see State v. Hamilton, 660 So.2d 1038, 1039 (Fla.1995) (applying the common law definition of curtilage to Florida’s burglary statute).
In emphasizing the danger of charging a defendant with the incorrect offense, the Fourth District noted, “If a home under construction meets the definition of a structure, but is not ready to be occupied as a dwelling, the safer course, in our opinion, would be to charge burglary of a structure. A new home, ready to be occupied, but not yet occupied, is a dwelling.” Anderson v. State, 831 So.2d at 703, n. 1 (citing Ratliff v. State, 668 So.2d 1090 (Fla. 1st DCA 1996)). It therefore appears that the Fourth District follows the interpretation of the Second District, in that the suitability for immediate habitability determines whether a structure constitutes a dwelling, as opposed to the intent for “eventual human habitation.” We find it useful to examine how other jurisdictions have handled similar issues.

Other Jurisdictions

The conflict among Florida district courts has been discussed in Colorado’s recent decision in People v. Morales, 298 P.3d 1000, 1012-13 (Colo.Ct.App.2012). In Morales, the defendant argued that the home he was convicted of burglarizing was not a dwelling within the meaning of Colorado’s burglary statute because at the time of the burglary it was uninhabited, was being “professionally remodeled” and was “nothing more than a construction site.” Id. at 1010. The burglarized home had been inhabited by a family for approxi *170 mately thirty-five years prior to being purchased for renovation and resale. Id. at 1002. The new owner “planned to replace the roof, windows, and siding, remodel the kitchen and bathrooms, and refinish the hardwood floors.” Id. At the time of the burglary, the contractors were in the process of demolishing the interior of the home and refinishing the floors. Id. “They had torn out the kitchen cabinets, moved the kitchen appliances, ripped up the carpeting, demolished a bathroom, taken out a fireplace, and removed ceiling tile, baseboards, trim, and several doors, among other things.” Id.
Colorado defines “dwelling” as follows: “Dwelling” means a building which is used, intended to be used, or usually used by a person for habitation.
Section 18-1-901 (S)(g), C.R.S.2011. The Morales court specifically disagreed with the Second District of Florida’s reasoning in Munoz. Morales, 298 P.3d at 1013. In concluding that the Munoz dissent was more persuasive than the majority opinion, the Morales court reiterated that the analysis of the Munoz majority was “inconsistent with the plain language of the statute, requiring only that a ‘dwelling’ be ‘designed’ for habitation.” Id. (quoting Munoz, 937 So.2d at 690) (Canady, J., dissenting). In reaching this conclusion, the Morales court also relied on People v. Silva, 256 Ill.App.3d 414, 195 Ill.Dec. 484, 628 N.E.2d 948 (1993), where an Illinois appellate court affirmed the trial court’s ruling that “apartments undergoing renovation were ‘dwellings’ because they were being prepared for residential use.”[3] Morales, 298 P.3d at 1012 (citing Silva, 195 Ill.Dec. 484, 628 N.E.2d at 952).
In Giles v. Commonwealth, 277 Va. 369, 672 S.E.2d 879, 881, 884 (2009), as a matter of first impression, the Supreme Court of Virginia held that “a dwelling house is a house that one uses for habitation as opposed to another purpose.” The defendant in Giles appealed his sentence for burglary under Virginia’s Code section 18.2-89, claiming that the building that he broke into was not a “dwelling house” because no one was living there at the time of the offense and it was not being regularly used for sleeping. Id. at 371-72, 672 S.E.2d 879.Code section 18.2-89 provides, in pertinent part, “[i]f any person break and enter the dwelling house of another in the nighttime with intent to commit a felony or any larceny therein, he shall be guilty of burglary.” The home that was broken into was described as a house that had furniture in three bedrooms, the living room, family room and kitchen. Id. at 371, 672 S.E.2d 879. The owner, whose primary residence was in Baltimore, Maryland, “had his own sleeping quarters in the house, and he kept food in the pantry, cabinets, and refrigerator. The house had operational utility services, including electricity and water. During the break in, [the defendant] took food, quilts, blankets, sheets, towels, bathroom supplies, two televisions, and a videocassette recorder from the house.” Id. The Supreme Court of Virginia held that
a house is a dwelling house pursuant to Code § 18.2-89 when the house is used for habitation, including periodic habi *171 tation. Periodic habitation does not require that the house be used at regular intervals. Rather, periodic habitation requires that when the house is used, it is used for the purpose of habitation. Thus, a dwelling house is a house that one uses for habitation, as opposed to another purpose.
Id. Although the home in Giles seems to be substantially furnished, which implies that it is suitable for immediate occupancy, which seems to be required by the Munoz court, the reasoning of the Giles court seems to be more aligned with the dissent in Munoz, which looks to the purpose of the home in determining its “dwelling status.”
In contrast, in Johns v. Commonwealth, 53 Va.App. 742, 675 S.E.2d 211 (2009) the Virginia Court of Appeals distinguished the building involved from that described in Giles. In Johns, the defendant was convicted of residential burglary, after he stole tools and construction supplies from a house. Id. at 212. The house was being remodeled so that it could be placed “on the market for someone to live there.” Id. at 215.
At the time of these events, no one lived in the house. No testimony at trial indicated how long the house had been empty. Although the house had a defined living area, dining area, and kitchen, none of these areas were described as containing furniture or any of the normal items found in an inhabited residence. The only items in the house were tools and construction supplies-such as a table saw, a tool belt, levelers, a skill saw, utility knives, tape measures, and sheet rock. For example, [the owner] used the kitchen to “store[] [his] tools when [he] was not there.”
Id. The house had a lock on the front door but did not have electricity. Id. The court acknowledged that “[t]he general public may equate the term ‘house’ with any building that appears from the outside to provide habitation at some time.... ” Id. at 218. However, the court explained that in Virginia, the term “dwelling house” seems to have a more limited meaning. Id. at 214 (citing Rash v. Commonwealth, 9 Va.App. 22, 383 S.E.2d 749, 751 (1989), where the same court determined that “a dwelling is no longer a ‘dwelling house’ for purposes of Code section 18.2-89 when its occupants leave it without any intention to return.”).
The Virginia Court of Appeals distinguished the home in the Johns case from that in Giles, by highlighting that the house was “completely unfurnished,” that it was not being used for the “usual activities of life,” the house was not “being maintained for immediate occupancy” and that “no previous resident intended to return and use the house as a ‘dwelling house.’” Id. at 215. The court acknowledged that the owner in Johns “owned the building, through a corporation, as a business investment — not for habitation” and that he “was remodeling the house for sale, not so his own family could live there.” Id. at 214.

This Case

The evidence presented in the case under review demonstrates that the burglarized home was located in a residential neighborhood, was substantially completed, and had a roof, drywall, and a door secured with a lock. The Fifth District determined that the house in this case is in fact a dwelling. The Fifth District did not provide its reasoning for this determination, and only cited its conflict with Munoz. However, it seems reasonable to assume that the Fifth District found the house to be a dwelling based on its purpose of “eventual human habitation,” and not the appearance of the home at the time of the burglary, as is consistent with its *172 previous decision in Michael v. State, 51 So.3d 574 (Fla. 5th DCA 2010).
If the character of a house and its suitability for lodging in fact refer to the appearance of the house and its suitability for immediate habitability, anyone who fails to regularly maintain the appearance of his or her home or decides to renovate his or her home, except during a state of emergency, risks losing the protections of increased penalties for burglary of a dwelling.[4] This seems to be an unreasonable conclusion. It is evident from the language of the statute and is more reasonable that the Legislature intended for character and suitability for lodging to refer to the purpose of the structure. The purpose of a house does not change due to the owner’s choice to update or remodel the structure. However, if a homeowner “substantially chang[es]” his or her home to create an office building, it is reasonable for this home to lose the status of “dwelling” as the purpose of the building has changed, along with the appearance. See Perkins, 682 So.2d at 1084. The fact that a house is undergoing renovations does not change its status as a dwelling, so long as its purpose is a house for lodging by people at night. The Fifth District did not err in affirming Young’s conviction of burglary of a dwelling.
Carjacking
A carjacking occurs when the state establishes the following three elements: “[1] the taking of a motor vehicle which may be the subject of larceny from the person or custody of another, [2] with intent to either permanently or temporarily deprive the person or the owner of the motor vehicle, [3] when in the course of the taking there is use of force, violence, assault, or putting in fear.” § 812.133(1), Fla. Stat. (1993). Young contends that he cannot be charged with carjacking, claiming that there was no force used in the taking of the car, only in the taking of the keys and other items.
At trial, and subsequently on appeal, the defense claimed that the case of Flores v. State, 853 So.2d 566 (Fla. 3d DCA 2003), required that Young’s charge for carjacking be reduced to grand theft where there was no subsequent force in the taking of the vehicle on the outside of the building. The trial court denied Young’s motion, citing a distinction between stealing the victim’s keys, as in the instant case, and stealing the victim’s purse with the keys inside, as in Flores. The jury convicted Young of carjacking.
In Flores, the defendant demanded money during a robbery of a hair salon, stole the owner’s purse and the purses of her patrons, locked the owner and the patrons in the salon bathroom and stole the owner’s car. Id. at 567. On appeal, the Third District found that the “theft of the victim’s car was a fortuitous event occasioned only upon the defendant’s ... discovery of the car keys in [the victim’s] purse as he searched for money,” which he initially demanded upon entering the salon. Id. at 570 n. 5. The court concluded that the use of force, violence, assault or putting in fear was only used by Flores during the course of the robbery of the purse, not the taking of the motor vehicle.[5] Id. at 570. The *173 Third District found it to be persuasive that the victim “was most likely unaware of the theft of her car due to her confinement in the bathroom.” Id. at 570. The Third District reversed the defendant’s conviction, reducing the defendant’s carjacking charge to grand theft of an automobile. Id. at 570.[6]
The Fourth District’s application of the statute in Carter v. State, 28 So.3d 1238 (Fla. 4th DCA 2009), is more persuasive. In Carter, the defendant beat a taxicab driver, stole his glasses, and drove away in the taxicab, after the taxicab driver ran away in fear. Id. at 1241. The victim in Carter ran away in fear of further physical violence from the defendant and was “likely unaware of the theft of [his] car, just as the victim in Flores.” Flores, 853 So.2d at 570. The defendant in Carter argued that his use of force “was too disconnected from the taking of the taxicab” to sustain a carjacking conviction. Carter, 23 So.3d at 1241. The Fourth District concluded that the robbery was not an afterthought, but that the “beating of [the victim] intertwined with the taking of the taxicab in time and place, so that the use of force occurred ‘in the course of the taking’ within the meaning of section 812.133(3)(b),” and therefore constituted a carjacking. Id. at 1242.
The Legislature has determined that “[a]n act shall be deemed ‘in the course of the taking’ if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events.” § 812.133(3)(b), Fla. Stat. (1993). In the instant case, Young entered the house and asked the victim, “Where’s it at?” He then proceeded to reach into the victim’s pockets and removed the victim’s cell phone, keys and wallet. Young then walked outside of the house and used the keys to drive away in the victim’s truck. The victim testified that upon receiving his truck back, all items were accounted for except his cell phone, which implies that Young was more concerned with taking the vehicle rather than the items located therein, and that the taking of the truck was not an afterthought to the robbery of the other property. Young placed the victim in fear in order to gain access to the car that he stole. We find that the putting in fear of the victim in order to take the victim’s keys before walking outside and driving away in the victim’s car constitutes a continuous series of events, as to classify the fear as being within the course of taking the vehicle, within the meaning of section 812.133(3)(b).
Young’s access to the victim’s car was prompted by Young’s actions which placed the victim in fear, and allowed him to commit a robbery of the victim’s money and keys. Young argued that once he exited the building where the robbery occurred, the robbery was complete and anything that occurred outside of the building is a separate crime. This argument is not persuasive in light of the Legislature’s definition of what constitutes “in the course of taking.” To allow these criminal acts to be so easily separated would render the Legislature’s definition of “in the course of taking” meaningless. See § 812.133(3)(b), Fla. Stat. (“An act shall be deemed ‘in the course of the taking’ if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a contin *174 uous series of events.”) (emphasis added). Further, it is unreasonable to assume that the Legislature intended for Young to receive the benefit of a lesser penalty as a result of his decision to enter the building that the victim was renovating to steal the keys, as opposed to taking the victim’s car after the victim exited the building. See State v. Atkinson, 831 So.2d 172, 174 (Fla.2002) (“A basic tenet of statutory construction compels a court to interpret a statute so as to avoid a construction that would result in unreasonable, harsh, or absurd consequences.”). The Fifth District did not err in affirming Young’s conviction of carjacking.
CONCLUSION
Based on the foregoing, we approve the Fifth District’s decision to affirm Young’s convictions of burglary of a dwelling and carjacking; we disapprove the Second District’s decision in Munoz and the Third District’s decision in Flores to the extent that they are inconsistent with this opinion.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, CANADY, LABARGA, and PERRY, JJ., concur.

. All convictions are first-degree felonies and Count I, burglary of a dwelling with an assault or battery with a dangerous weapon, is a life felony. As the jury did not find that the defendant used a firearm in the commission of the crime, the State decided to nolle pros count IV, possession of a firearm by a convicted felon.

. The Fifth District previously certified conflict with Munoz on this issue in the case of Michael v. State, 51 So.3d 574 (Fla. 5th DCA 2010), wherein the Fifth District agreed with the "well-reasoned dissent” in Munoz. Id. at 575.

. Illinois’ Criminal Code defines "Dwelling” as follows: (a) Except as otherwise provided in subsection (b) of this Section, "dwelling” means a building or portion thereof, a tent, a vehicle, or other enclosed space which is used or intended for use as a human habitation, home or residence; (b) For the purposes of Section 19-3 [Residential Burglary] of this Code, "dwelling” means a house, apartment, mobile home, trailer, or other living quarters in which at the time of the alleged offense the owners or occupants actually reside or in their absence intend within a reasonable period of time to reside. Ill.Rev.Stat.1991, ch. 38, par. 2-6; codified as 720 ILCS 5/2-6 (West 1992).

. See § 810.02, Fla. Stat. (2009); § 775.082, Fla. Stat. (2009).

. The case under review is more analogous to a different case decided by the Third District, Baptiste-Jean v. State, 979 So.2d 1091 (Fla. 3d DCA 2008). In Baptiste-Jean, the defendant and an accomplice tied the victim up, beat him and took the car keys from his pocket. Id. at 1092. The perpetrator loaded the victim’s car with the stolen items and used the stolen keys to take the victim's car. Id. In Baptiste-Jean, the court concluded that although the force involved in the taking of the keys occurred prior to the taking of the *173 car, it occurred in the course of the taking of the vehicle itself. Id.

. The Third District distinguished this from the case of Price v. State, 816 So.2d 738, 741 (Fla. 3d DCA 2002), where it held that the defendant could properly be convicted of carjacking where he demanded and retrieved the victim's car keys at gunpoint as the victim was getting into her car.