RAY, J.
In this direct appeal, Ralph Monroe challenges his judgment and sentence for capital sexual battery on a child under 12 years of age by a defendant 18 years of age or older and lewd or lascivious molestation on a child under 12 years of age by a defendant 18 years of age or older. The trial court designated Monroe a sexual predator and sentenced him to a mandatory life sentence without parole for capital sexual battery and to 40 years’ incarceration for lewd or lascivious molestation.
We affirm Monroe’s judgment and sentence and write to explain our reasoning on two issues: (1) whether the trial court erred by denying the motion to suppress Monroe’s statements made to an investigator in light of the fact that the investigator failed to read Monroe his Miranda[1] rights prior to questioning him, and (2) whether the evidence was sufficient to prove that the offenses occurred when Monroe was 18 years of age or older. On the first point, we hold that the trial court properly denied the motion to suppress because Monroe was not “in custody” at the time of his confession, and therefore, no Miranda warnings were necessary. On the second point, we conclude that the sufficiency-of-the-evidence claim was not properly preserved for appellate review and does not rise to the level of fundamental error under the standard adopted in F.B. v. State, 852 So.2d 226 (Fla.2008). However, we certify a question of great public importance regarding the applicability of that standard where, as here, it makes a constitutionally significant difference in the penalties applicable to the defendant.

Suppression Issue

I. Facts
The sexual battery charge alleged that Monroe digitally penetrated victim T.J.’s anus. The charge of lewd or lascivious molestation alleged unlawful, intentional touching of T.J.’s breasts, genitals, genital area, buttocks, or clothing over them in a lewd or lascivious manner. Monroe moved to suppress his statements obtained during what he argued was an illegal custodial interrogation. The parties generally agreed regarding the material facts surrounding the interview.
At the suppression hearing, Special Agent Terry Thomas of the Florida Department of Law Enforcement testified that he interviewed T.J. and a second child, who alleged they were victims of crimes at the Florida Agricultural and Mechanical University Developmental Research School. As a result of these interviews, Monroe became a suspect. Monroe was a high-school senior and the children were elementary-school students at the K-12 facility at the time of the incidents.
Agent Thomas obtained an arrest warrant for Monroe, who was by that time a college freshman in Alabama. The agent testified that he traveled to Alabama to talk to Monroe and to elicit a confession. The agent had no arrest authority in Alabama, but he had made arrangements before the interview for Monroe ultimately to be arrested on the warrant. The agent stated that his intent was to conduct a noncustodial interview.
Upon arriving at the college campus, Agent Thomas met with the college police chief and arranged through the dean of students to interview Monroe. Monroe’s college football coach escorted Monroe to an unlocked, publicly accessible conference *853 room, where Monroe first met Agent Thomas, who wore jeans and a T-shirt and did not display a weapon. Monroe took a seat closest to the exit door while Agent Thomas sat on the other side of the table. Prior to conducting the taped interview, Agent Thomas introduced himself to Monroe, presented his credentials, and explained his purpose for being there. The agent testified that he made no threats or promises to Monroe before the taped interview.
The audiotape of the twenty-minute interview was played for the trial court and revealed the following. Agent Thomas informed Monroe that he was conducting an investigation involving an eight-year-old male student, a matter Monroe had previously discussed with a school resource officer. After Monroe acknowledged that he knew what the agent was talking about, Agent Thomas stated:
You don’t have to talk to me. That’s why I brought you in here. You can get up and leave any time you want, but I’m hoping that, you know, you could explain your side of the story here. Like I said, I’ve interviewed the eight-year-old boy and he has identified you as somebody that’s done some inappropriate stuff to him and he’s picked you out of a photo pack, a photo lineup [unintelligible]. Is that you in the middle there?
Monroe admitted that it was his photo. Agent Thomas told Monroe that the victim had given him details of what Monroe did to him in the school bathroom. Monroe denied any wrongdoing. When asked why the boy would make up the allegations, Monroe opined, “He could lie.” Monroe admitted having been in the bathroom with the boy but claimed he simply walked out as the boy entered the room. As the conversation continued, Monroe repeatedly denied wrongdoing and Agent Thomas repeatedly accused him of lying, reiterating the seriousness of the allegations.
Agent Thomas asked, “What do you think I should do with you? Do you think I drove all the way up here to have you tell me nothing happened?” Despite having denied wrongdoing, Monroe suggested that Agent Thomas could occasionally check to see how and what Monroe was doing. Agent Thomas asked Monroe if he was afraid he was “going to do something like this again,” and Monroe expressed concern that this type of allegation could come up again.
The agent reminded Monroe that the child had given a detailed statement and picked out Monroe’s photo. Agent Thomas acknowledged that “we all make mistakes” and then asked whether he was supposed to return to Tallahassee to tell the story as if the child were a liar. Monroe answered “no,” but he reasserted that the child was lying about any touching. Monroe again urged Agent Thomas to call and check on him every now and then, “just to be safe.” Agent Thomas asked why he would need to check on Monroe if he had never done anything. Again, Monroe denied wrongdoing, and the agent replied, “I don’t believe you.” He reminded Monroe that he was free to get up and leave.
Agent Thomas stated that he was trying to treat Monroe “like a man” and with respect. When Monroe asked what would happen if he left the room right then, Agent Thomas replied that he had a legal obligation to continue investigating. Monroe restated that he had walked out of the bathroom as soon as the child walked in, and no touching occurred. Monroe conceded that, at most, he may have said “hey” to the child. After more exchanges in which Agent Thomas expressed his belief that the child’s allegations were true and Monroe denied them, Agent Thomas *854 stated that his lengthy experience indicated that little kids do not make up such accusations. Agent Thomas noted that when the child made the allegations, he was not in trouble. Monroe reiterated that the child had fabricated this story.
Agent Thomas reminded Monroe that he was missing an opportunity, and the agent was going to continue the investigation. Agent Thomas indicated that the interview was ending, but that this matter was not going away. He also told Monroe that he could not “undo what [he] did” but that Monroe “could make it better.” Monroe then asked whether he could get counseling. Agent Thomas answered affirmatively and stated that first, Monroe would have to admit what he had done. Monroe ultimately agreed to “open up.”
Monroe told the agent that after saying “hey, how you doing,” he touched the child. Claiming he was trying to handle this situation differently from the way most officers would handle it, Agent Thomas said, “I know you want to talk about it. It’s probably going to weigh on you since it happened.” Agent Thomas told Monroe that “most cops” would have just walked in, put handcuffs on him, and taken him away.
The agent then asked Monroe to tell him what actually happened. Monroe replied, “I walked in there. I saw him coming in. Do you want to play a game, with him? Basically, sex .... what you said.” Agent Thomas indicated that Monroe was “on the right track.” In response, Monroe admitted having touched the child, gesturing to show what he had done. With Agent Thomas urging him to proceed because there was more, Monroe denied doing anything else. The agent asked, “Put your finger in his butt; right?” Monroe answered, “At that part, yeah.” Additionally, Monroe acknowledged asking the child if he wanted to play a game, and Monroe admitted touching the child’s penis with his hand.
Monroe stated that since making a bad choice, he had been training himself to be a better role model and to make a better life for himself. He said Agent Thomas could tell the child’s family or his teachers that Monroe was deeply sorry and that nothing like it would ever occur again. The agent confirmed with Monroe that it would be all right to report that he had “manned up” and admitted the allegations.
Agent Thomas testified that at the conclusion of the interview, he turned off the tape, opened the door, and invited the police chief, the dean of students, and the coach to enter the room. The dean talked to Monroe about being removed from the college. They did not put Monroe in handcuffs, but he was escorted to an unmarked police car to leave the college campus. The agent said he had taken steps to ensure that Monroe would feel free to leave the conference room anytime and would not believe he was in official custody. Agent Thomas testified he never raised his voice, acted aggressively, or threatened or badgered Monroe.
After this testimony, defense counsel argued that the procedural safeguards in Miranda are designed to protect persons like Monroe from law enforcement’s use of trickery and manipulation to solicit an involuntary confession. The defense asserted that the interview constituted a custodial interrogation without the required reading of Miranda rights before the questioning commenced. The trial judge denied the motion to suppress.
II. Law
A ruling on a motion to suppress involves a mixed question of fact and law. Mixed questions that ultimately determine constitutional rights should be reviewed with deference to the trial court on ques *855 tions of historical fact. Connor v. State, 808 So.2d 598, 605-08 (Fla.2001). We have de novo review of the application of a constitutional standard to the facts. Id.; MacKendrick v. State, 112 So.3d 131, 136 (Fla. 1st DCA 2013). In reviewing the ruling on a motion to suppress, we interpret the evidence and all reasonable inferences in a light most favorable to sustaining the order. Murray v. State, 692 So.2d 157,159 (Fla.1997).
Appropriate warnings must precede “custodial interrogation,” which is “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In this particular context, “the term ‘interrogation’ ... refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police know are reasonably likely to elicit an incriminating response from the suspect.” Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); cf. Traylor v. State, 596 So.2d 957, 966 n. 17 (Fla.1992) (noting that under the Florida Constitution an interrogation occurs when a “reasonable person would conclude [express questions or actions] are designed to lead to an incriminating response”).
The test for determining whether a suspect is in custody for purposes of Miranda is whether “under the totality of the circumstances, a reasonable person in the suspect’s position would feel a restraint of his or her freedom of movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police.” Connor, 803 So.2d at 605. For guidance in making this totality-of-the-circumstances assessment, Florida courts consider the following factors, set forth in Ramirez v. State, 739 So.2d 568, 574 (Fla.1999):
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Under this objective, reasonable-person framework, no single factor may “be considered in isolation”; rather, “[t]he whole context must be considered.” State v. Pitts, 936 So.2d 1111, 1124 (Fla. 2d DCA 2006). “The whole point of the custody analysis is to determine whether, given the circumstances, ‘a reasonable person [would] have felt he or she was ... at liberty to terminate the interrogation and leave.’ ” J.D.B. v. North Carolina, — U.S. -, 131 S.Ct. 2394, 2407, 180 L.Ed.2d 310 (2011) (quoting Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).
III. Analysis
The dispute at issue involves the application of well-settled law to the facts. It cannot be reasonably denied that Agent Thomas’s questioning of Monroe constituted official interrogation, for the agent’s words or actions were “reasonably likely to elicit an incriminating response” from Monroe. Innis, 446 U.S. at 301, 100 S.Ct. 1682; see MaeKendrick, 112 So.3d at 140. The pivotal issue is whether it was a “custodial” interrogation. To resolve this legal question, we consider the four Ramirez factors.
First, we conclude that Agent Thomas’s manner of summoning Monroe does not suggest a custodial environment, as the meeting was arranged through college officials; Monroe was escorted by his football *856 coach, rather than a law enforcement officer; and Agent Thomas greeted Monroe alone and in plain clothes.
Second, “the purpose, place, and manner of the interrogation” does not indicate that Monroe was in custody. We find significant that the meeting took place in a publicly accessible, unlocked conference room on a college campus, rather than at a police station. The campus conference room did not present the same “inherently coercive pressures” as the police station questioning did in Miranda. See Howes v. Fields, — U.S. -, 132 S.Ct. 1181, 1189-90, 182 L.Ed.2d 17 (2012). Further, Agent Thomas conducted the interrogation in a conversational tone free of threats or promises, and nothing in the record indicates that Monroe, who sat closer to the exit, was in any way prevented or hindered from leaving. See Cilio v. State, 849 So.2d 353, 355-56 (Fla. 2d DCA 2003) (concluding that evidence did not suggest a coercive atmosphere during interview at sheriffs office, where detectives made no threats or promises, defendant did not appear to be intimidated or subdued by detectives’ presence, and their tone was conversational). Although Agent Thomas was persistent, opinionated, and orally confrontational, he did not use coercive measures to elicit information from Monroe during the relatively brief interview. Cf. Ross v. State, 45 So.3d 403, 415-16 (Fla.2010) (concluding that defendant was in custody for Miranda purposes where detectives questioned him for hours in a small room, confronted him with strong evidence of his guilt, repeatedly told him that they knew he had committed the crime and that the only remaining question was why he had done so, were “highly confrontational and accusatorial,” and never told defendant he was free to leave).
Monroe argues that he was effectively under arrest and in custody when Agent Thomas interviewed him because the agent already had an arrest warrant. Significantly, however, Agent Thomas did not disclose the existence of the warrant during the interview, and the record does not suggest that Monroe had any prior independent information that the agent had an arrest warrant. Absent a restraint on Monroe’s movement to a degree associated with an actual arrest, the fact that the agent already had a warrant for Monroe’s arrest and hoped to obtain a confession does not conclusively establish that Monroe was in custody for Miranda purposes. Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (“A policeman’s unarticulated plan has no bearing on the question whether a suspect was ‘in custody’ at a particular time .... ”); Davis v. State, 698 So.2d 1182, 1188 (Fla.1997). The surrounding circumstances support the trial court’s conclusion that this second Ramirez factor weighs in favor of the State. See Perez v. State, 919 So.2d 347, 360-61 (Fla.2005); Bedoya v. State, 779 So.2d 574, 579 (Fla. 5th DCA 2001).
The third Ramirez factor addresses the extent to which Monroe was confronted with evidence of his guilt. Although Agent Thomas repeatedly provided Monroe with generalized evidence of his guilt, the agent did not initially disclose much of the substance of the child’s statement. Agent Thomas told Monroe that the victim reported inappropriate touching and an offer from Monroe to play a game, but it was Monroe who eventually provided specific details (not previously disclosed to him by the agent) about where and how he touched the victim. On the other hand, Monroe knew at least something about the victim’s allegations before the interview due to his contact with the school resource officer, and Agent Thomas encouraged Monroe when he was “on the right track” according to the victim’s allegations. The third factor presents a close question, but *857 the record supports the trial court’s decision to weigh it in favor of the defense.
The fourth factor is whether law enforcement advised Monroe that he was free to leave. The defendant in Ramirez was never told he was free to leave during the course of his interview at the police station. 739 So.2d at 574. In stark contrast, Agent Thomas repeatedly informed Monroe that he was free not to talk and to get up and leave the room anytime. While Agent Thomas added that “most cops” would have handcuffed Monroe and taken him away, Monroe understood that he was free to terminate the interview and to leave the room, for he asked the agent what would happen if he did so. Agent Thomas replied truthfully that as a law enforcement officer, he had a legal obligation to continue investigating the allegations. This response in no way indicates that Monroe was in custody; to the contrary, it suggests that additional investigatory work was necessary prior to an arrest. Monroe acknowledges that this fourth factor “arguably weighs” in the State’s favor, the trial court found this to be the case, and we agree.
In consideration of the four Ramirez factors, we conclude that the totality of the circumstances supports the trial court’s determination that Agent Thomas’s questioning of Monroe was not custodial for Miranda purposes. Even though the third factor weighs in favor of the defense, the remaining circumstances would indicate to a reasonable person that he was free to leave and terminate the encounter. Because it was not necessary to read Miranda warnings before or at any time during Monroe’s interview, the trial court correctly denied the motion to suppress.

Sufficiency of the Evidence

I. Facts
The information charged Monroe with capital sexual battery and lewd or lascivious molestation, both involving a child younger than 12. If the jury found Monroe guilty of either or both of these offenses, the verdict form allowed the jury to determine whether Monroe was younger than 18 years of age, or 18 or older, when he committed the crime(s). The evidence established that Monroe battered and molested the victim during Monroe’s senior year of high school, but there was no evidentiary basis for determining whether the incident giving rise to the charges took place before or after Monroe’s eighteenth birthday, which occurred during that school year. The State attempted to establish Monroe’s age by questioning the victim about the timing of the incident, but the victim could not be sure exactly when it happened. During the vigorous cross-examination of the victim, it was obvious the defense was not conceding that Monroe was 18 or older when the incident occurred.
There was a clear factual dispute over whether Monroe was 18 years old at the time of the crimes, but defense counsel declined to challenge the sufficiency of the State’s evidence through a motion for a judgment of acquittal. In closing arguments, counsel told the jury that the prosecution had not met its burden to prove that Monroe was 18 or older when he committed the offenses. The jury found Monroe guilty of sexual battery and lewd or lascivious molestation, with specific findings that he was 18 or older at the time of the offenses. On appeal, Monroe asserts that the State failed to prove an essential element of the crimes of which he was convicted — that he was at least 18 years old when the offenses occurred.
II. Law and Analysis
At the outset, we must determine whether we may address this issue on direct appeal. Monroe concedes that the *858 issue was not preserved and, therefore, supports reversal only if he has established fundamental error under F.B. v. State, 852 So.2d 226, 280 (Fla.2003). In F.B., the Florida Supreme Court set forth specific rules for finding fundamental error in the insufficiency of the evidence to support a criminal conviction and recognized only two exceptions to the contemporaneous-objection requirement in this context. 852 So.2d at 229-30. The first exception deals exclusively with death-penalty cases and is inapplicable here. Id. at 230. The second exception occurs “when the evidence is insufficient to show that a crime was committed at all.” Id. The F.B. court elaborated on this exception as follows:
[A]n argument that the evidence is totally insufficient as a matter of law to establish the commission of a crime need not be preserved. Such complete failure of the evidence meets the requirements of fundamental error — i.e., an error that reaches to the foundation of the case and is equal to a denial of due process.
Id. (internal citations omitted).
Relying on this second exception, Monroe argues that fundamental error occurred due to a complete failure of proof by the State that he was 18 or older at the time of the offenses, resulting in convictions that carry substantially tougher penalties than those applicable to offenders under the age of 18. Indeed, a conviction for a sexual battery committed against a victim younger than 12 years old by a person 18 or older is a capital felony, with a mandatory sentence of life imprisonment without the possibility of parole. §§ 794.011(2)(a), 775.082(l)-(2), Fla. Stat. (2011). In contrast, a sexual battery committed against a victim younger than 12 by a person under the age of 18 is a life felony, meaning that the defendant is sentenced under the Criminal Punishment Code and the trial court has discretion to impose a sentence of less than life in prison. §§ 794.011(2)(b), 775.082(3)(a)3., Fla. Stat. (2011). A lewd or lascivious molestation committed against a victim younger than 12 by a person 18 or older is a life felony. § 800.04(5)(b), Fla. Stat. (2011). However, a lewd or lascivious molestation committed against a person younger than 12 by a person under the age of 18 is a second-degree felony, for which the penalty may not exceed fifteen years in prison. §§ 800.04(5)(c)l, 775.082(3)(c), Fla. Stat. (2011). Thus, the consequences of lack of preservation in this case, if the error is not fundamental, are substantial.
Consistent with Monroe’s argument, some decisions citing F.B. appear to have construed the second exception as holding that fundamental error occurs where there is a complete failure of proof that the crime for which the defendant was convicted, as opposed to simply any crime, occurred. See, e.g., Crain v. State, 79 So.3d 118, 122 (Fla. 1st DCA 2012) (finding fundamental error in the defendant’s conviction for driving on a suspended or revoked license where he never had a license at all, and remanding for an adjudication of guilt as to the lesser crime of driving without a valid driver’s license, which was proven); Hamilton v. State, 71 So.3d 247 (Fla. 4th DCA 2011) (reversing a conviction for robbery with a weapon due to fundamental error in the State’s reliance on a toy gun as its proof of the defendant’s use of a weapon); Rodriguez v. State, 964 So.2d 833 (Fla. 2d DCA 2007) (holding reversal was required “[b]ecause the State’s proof did not establish the crimes for which [the defendant] was convicted”); see also De La Hoz v. State, 997 So.2d 1198,1202 (Fla. 3d DCA 2008) (observing that the Second and Fourth Districts have interpreted F.B. as recognizing fundamental error when the evidence is “legally insufficient to prove the offense of which the defendant was convicted, but is legally sufficient to prove *859 a lesser included offense”); but see A.P.R. v. State, 894 So.2d 282, 286 (Fla. 5th DCA 2005) (observing that the second F.B. exception applies when “no crime was committed at all” and not when “the evidence is merely insufficient to prove an element of the crime charged”).
However, subsequent to these decisions, the supreme court applied F.B. more broadly in Young v. State, 141 So.3d 161 (Fla.2013). Young was convicted of burglary of a dwelling. 141 So.3d at 163. On appeal and before the Florida Supreme Court, Young raised the unpreserved argument that the structure he entered was not a dwelling because it was undergoing substantial renovations, and was arguably not suitable for lodging, at the time of the offense. Id. at 163-65. The court found this argument waived because the evidence suggested, “at the least, ... that [the defendant] committed a burglary of a structure.” Id. at 165. The court explained, “As the evidence indicates that a crime was in fact committed by [the defendant], [his] conviction cannot be said to be fundamental error.” Id. (emphasis added).
Young supports the more stringent reading of F.B. to require a showing that the evidence could not support the conviction of any crime whatsoever before an evidentiary deficiency may be held to constitute fundamental error. Only then will such a “complete failure of the evidence” rise to the level of fundamental error.[2] F.B., 852 So.2d at 230.
Applying this principle to the instant case, we must base our decision on the fact that there is competent, substantial evidence that Monroe committed a crime, even if not the crime reflected by the verdict. The evidence was legally sufficient to show that Monroe committed sexual battery and lewd or lascivious molestation at least as a juvenile, even if not as an adult. As the evidence indicates that Monroe did in fact commit a crime, his convictions cannot be said to be fundamental error under Florida Supreme Court precedent. Young, 141 So.3d at 165; F.B., 852 So.2d at 230-31. Monroe acknowledged at oral argument that we could not conclude otherwise without expanding the exception announced in F.B.
*860 Nonetheless, Monroe argues that the circumstances of this case indicate “classic fundamental error.” Fundamental error has generally been defined as that which “reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error” or error that “goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process.” F.B., 852 So.2d at 229 (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960), and J.B. v. State, 705 So.2d 1876, 1378 (Fla.1998)); cf. Garcia v. State, 901 So.2d 788, 793 (Fla.2005) (holding that the omission of a jury instruction on a disputed element of a crime is fundamental error). But recognizing the goals promoted by preserving error in the trial court, the F.B. court reached a very specific holding pertaining to challenges to the sufficiency of the evidence, identifying only two exceptions to the preservation rule as applied to these challenges. Neither exception applies here.[3]
We have considered whether F.B. and Young are distinguishable. We find it noteworthy, but not dispositive, that part of F.B. ’s justification for limiting the fundamental-error standard as applied to sufficiency-of-the-evidence challenges was that “[a]ny technical deficiency in proof may be readily addressed by timely objection or motion, thus allowing the State to correct the error, if indeed it is correctable, before the trial concludes.” 852 So.2d at 230. F.B. is arguably distinguishable because it involved a technical deficiency in proof. See id. (including this concept in the reasoning leading to the second exception); F.B. v. State, 816 So.2d 699, 701 (Fla. 4th DCA 2002) (expressly opining that the error might have been correctable if it had been brought to the court’s attention).
Young, however, is not distinguishable. As here, the issue in Young was not a matter of the State’s mere oversight in presenting the evidence available on a particular element. Rather, the State presented evidence it believed established the status of a burglarized structure as a dwelling, and the analysis of the issue depended on whether that evidence met the legal requirements of the statute defining the offense. See 141 So.3d at 171-72. Because the defendant in Young failed to argue to the trial court that the structure was not a dwelling as a matter of law, and the evidence established at least burglary of a structure, the argument was waived. Id. at 165. Similarly, here, Monroe failed to argue to the trial court that the proof the State presented of his age was not competent, substantial evidence that he was 18 years old at the time of the incident. In neither Young nor the instant case could any deficiency in the State’s proof have been corrected merely by reopening the case. In both cases, the State presented evidence intended to prove the element at issue on appeal with no indication that it could have produced more. Therefore, we cannot say that any omission in either case was a mere technical deficiency in the proof.[4]
*861 Applying F.B. to the instant case gives us pause because Monroe’s failure to preserve the issue resulted in a monumental disparity between the sentence the court was required to impose under the verdict for capital sexual battery and the sentence the court could have imposed under a verdict supported by competent, substantial evidence. The difference between preservation and silence in this case meant the difference between a mandatory sentence of life without parole and the availability of a term of years. Under Graham v. Florida, 560 U.S. 48, 74, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), a mandatory sentence of life without parole for a nonhomicide offense is unconstitutional when imposed against a juvenile offender. Therefore, the State’s failure to prove that Monroe was an adult at the time of his offenses has constitutional significance.
The Florida Supreme Court has not yet been asked to apply F.B. in a case where the defendant was convicted of one crime, the State proved only a crime charged as a lesser included offense, and the disparity between the sentencing options available for the proven crime and the crime reflected by the verdict is vast and carries constitutional implications. Given the concerns this case raises and the applicability of F.B. to any criminal case involving an unpreserved challenge to the sufficiency of the evidence, we certify the following question of great public importance to the Florida Supreme Court:
DO F.B. V. STATE, 852 So.2d 226 (Fla.2003), AND YOUNG V. STATE, 141 So.3d 161 (Fla.2013), REQUIRE PRESERVATION OF AN EVIDENTIARY DEFICIENCY WHERE THE STATE PROVED ONLY A LESSER INCLUDED OFFENSE AND THE SENTENCE REQUIRED FOR THE GREATER OFFENSE WOULD BE UNCONSTITUTIONAL AS APPLIED TO THE LESSER OFFENSE?
AFFIRMED; QUESTION CERTIFIED.
WOLF and PADOVANO, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The Florida Supreme Court relied on the broad language of F.B. in Insko v. State, 969 So.2d 992 (Fla.2007), as well, but under rather unique circumstances. Insko was charged with lewd or lascivious conduct under a statute requiring the offender to be over the age of eighteen. 969 So.2d at 994. The defendant was, in fact, thirty-three years old at the time of the crime. Id. However, in an apparent exercise of its pardon power, the jury convicted the defendant of a lesser-included offense applicable when the defendant is under the age of eighteen. Id. at 994, 1001-02. This conviction was reversed due to the improper admission of the defendant’s prior bad acts. Id. at 994. On remand, the defendant moved to dismiss the case, asserting that the State could not prove the essential element that he was under the age of eighteen because his birth certificate refuted this element. Id. at 994-95. The defendant could not be retried on the greater offense because he had already been acquitted of it. Id. at 997.
The Florida Supreme Court held that Insko had waived the right to challenge the age element of the lesser offense by failing to object to the jury’s consideration of that charge in the first trial and, indeed, by specifically stating that he had no objection to it. Id. at 1001-02. The court then held that the State’s inability to prove that the defendant was under the age of eighteen did not amount to fundamental error because the evidence was "not insufficient to show that a crime was committed.” Id. at 1002. For this reason, the Insko court held that the defendant was bound by the waiver he accomplished in the first trial and would not be heard to complain about the insufficiency of the evidence in the anticipated second trial. Id. Due to the court’s conclusion that the first verdict was a jury pardon, it is clear that the State presented evidence of the defendant’s age in the first trial, thus establishing not only a crime was committed, but the greater offense.

. Monroe did not raise ineffective assistance of counsel on the face of the record, and we would be reticent to find it under these circumstances. Finding ineffective assistance of counsel on the face of the record due to the failure to raise the insufficiency of the evidence to support a conviction before the trial court would be tantamount to holding that such an issue need not be preserved, contrary to the holding in F.B.

. Incidentally, the Young court decided to address the merits of the issue despite the waiver and opined that the State's evidence was sufficient. 141 So.3d at 171-72.